## SWIFT AND COMPANY *v.* UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 103. Argued January 6, 7, 1905.—Decided January 30, 1905.

A combination of a dominant proportion of the dealers in fresh meat throughout the United States, not to bid against, or only in conjunction with, each other in order to regulate prices in and induce shipments to the live stock markets in other States, to restrict shipments, establish uniform rules of credit, make uniform and improper rules of cartage, and to get less than lawful rates from railroads to the exclusion of competitors with intent to monopolize commerce among the States, is an illegal combination within the meaning and prohibition of the act of July 2, 1890, 26 Stat. 209, and can be restrained and enjoined in an action by the United States.

It does not matter that a combination of this nature embraces restraint and monopoly of trade within a single State if it also embraces and is directed against commerce among the States. Moreover the effect of such a combination upon interstate commerce is direct and not accidental, secondary or remote as in *United States* v. *E. C. Knight Co.*, 156 U. S. 1.

Even if the separate elements of such a scheme are lawful, when they are bound together by a common intent as parts of an unlawful scheme to monopolize interstate commerce the plan may make the parts unlawful.

When cattle are sent for sale from a place in one State, with the expectation

they will end their transit, after purchase, in another State, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a constantly recurring course, it constitutes interstate commerce and the purchase of the cattle is an incident of such commerce.

A bill in equity, and the demurrer thereto, are neither of them to be read and construed strictly as an indictment but are to be taken to mean what they fairly convey to a dispassionate reader by a fairly exact use of English speech.

THE facts are stated in the opinion.

*Mr. John S. Miller,* with whom *Mr. Merritt Starr* was on the brief, for appellants:

The charges in each of the paragraphs or counts of the bill or petition of alleged violations of the Sherman Act are, respectively, mere statements of legal conclusions. Each is bad on demurrer for that reason.

These charges would be bad on that ground, even in an indictment under this act. *In re Greene,* 52 Fed. Rep. 104; *United States* v. *Cruikshank,* 92 U. S. 542, 563; *United States* v. *Simmons,* 96 U. S. 360; *United States* v. *Carll,* 105 U. S. 611; *United States* v. *Britton,* 107 U. S. 655; *Hazard* v. *Griswold,* 21 Fed. Rep. 178. And *a fortiori* are they bad in a bill or petition in equity, which is required to state the facts essential to the cause of action. *Lawson* v. *Hewell,* 118 California, 613; *Wright* v. *Dame,* 22 Pick. 59; *Ambler* v. *Choteau,* 107 U. S. 586; *Van Weel* v. *Winston,* 115 U. S. 228, 237; 1 Foster Fed. Prac. § 67.

The *facts* alleged are looked at and not adjectives or adverbs or epithets. *Magniac* v. *Thompson,* 2 Wall. Jr. 209; *Price* v. *Coleman,* 21 Fed. Rep. 357; *Van Weel* v. *Winston,* and *Ambler* v. *Choteau, supra.*

The importance of applying this rule with strictness here is more marked because answer by the defendants under oath is called for. This point is properly raised by demurrer. 1 Daniel Ch. Pr. 372. It was so raised in *Van Weel* v. *Winston, supra.*

The decree complained of, which is merely one of injunction, is erroneous on like grounds of indefiniteness. *Laurie* v.

*Laurie*, 9 Paige, 234, 235; *Robinson* v. *Clapp*, 65 Connecticut, 365; *Whipple* v. *Hutchinson*, 4 Blatchf. 190.

It makes clear the misconception of the Sherman Act and of Federal power to regulate commerce upon which the bill and decree proceed. They appear to go upon the theory that under the act of Congress the Federal courts are to regulate commerce, and the decree enjoins, not specific acts, but violations of the statute in terms as general as the act of Congress itself. A defendant cannot know from its terms what he may or may not do without making himself liable as in contempt.

This makes the insufficiency of the bill more obvious, as no valid decree could have been entered upon its allegations.

The provisions of the Sherman Act do not contemplate such a general proceeding or decree to interfere in advance with future dealings, as interstate commerce, which may be interstate trade or may be domestic trade according to the future and changeable intention of the dealers. *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 15.

The business of defendants of purchasing live stock and of selling fresh meats produced therefrom, as described in the bill, is not, upon the allegations of fact in the bill, interstate or foreign commerce.

The purchase of cattle as alleged and described in the first paragraph of the bill is not alleged or shown to be interstate commerce.

The business of defendants of selling such fresh meats, at the several places where they are so prepared, as described in the second paragraph, is not, under the facts there alleged, interstate trade or commerce. The sales and deliveries, although to dealers in other States and Territories, are there alleged to be made at the places where the meats are prepared by defendants, and are domestic sales.

The deliveries by defendants to the carriers, who are agents of the purchasers in that respect, under the allegations of the bill, are deliveries to the purchasers in the State where the sale is made; and the sales and deliveries are there fully completed.

*Merchant* v. *Chapman*, 4 Allen, 362; *Orcutt* v. *Nelson*, 1. Gray, 543; *Waldron* v. *Romaine*, 22 N. Y. 368; *Ramsey & Gore Co.* v. *Kelsea*, 55 N. J. L. 320; *Cotte* v. *Harden*, 4 East. 211; *Brown* v. *Hodgson*, 2 Camp. 86; *Groning* v. *Needham*, 5 Maule & S. 189; 2 Kent. Com. 499; *Crossman* v. *Lurman*, 192 U. S. 189, 198.

The sellers' act in delivering the merchandise to the common carrier, or carrying the merchandise to the carrier's depot (if that is taken to be in effect alleged), is not any part of the interstate transportation, and does not make the goods the subject of interstate commerce. *Coe* v. *Errol*, 116 U. S. 517, 528.

The fact that the sale is made with a view to the goods being transported by the buyer's agent to another State after the sale and delivery is fully completed, does not make the sale interstate commerce.

The sales alleged in the third paragraph of the bill, by agents of the owners in other States and Territories to whom the owners of the fresh meats have shipped the same for sale there by such agents on the ground, are not incidents of interstate commerce. *Coe* v. *Errol*, 116 U. S. 517, 525; *Kidd* v. *Pearson*, 128 U. S. 1, 23; *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 13, 17; *Austin* v. *Tennessee*, 179 U. S. 343; *Crossman* v. *Lurman*, 192 U. S. 189, 198; *Am. Harrow Co.* v. *Shaffer*, 68 Fed. Rep. 750; *Stevens* v. *Ohio*, 93 Fed. Rep. 793.

Under the allegations here in question, it is to be taken that the meats, before the sales here referred to are made, have come to their place of rest and are at rest for an indefinite time awaiting sale at their place of destination, and are a commodity in the market where the sales are made; and that the sales are not in the "original packages"; and that the meats, at the time of the sales, have become a part of the general property in the State where sold, and are there handled and sold as such. *Southern Coal Co.* v. *Bates*, 156 U. S. 577, 588; *Brown* v. *Houston*, 114 U. S. 623, 632; *Emert* v. *Missouri*, 156 U. S. 296, 310; *Singer Mfg. Co.* v. *Wright*, 97 Georgia, 123.

The point here made is entirely consistent with the rulings

in many cases, that the owner of merchandise, who transports
it from one State to another for sale, has a right (which cannot
be interfered with by state or municipal laws) to sell it as an
article of interstate commerce.   He also has a right to make
such article part of the general property of the State into which
it is taken, and he then has the right to sell and others have the
right to purchase it as an article of domestic commerce, which
cannot be interfered with by Federal law.   The Sherman Act
does not seek to and could not interfere with that right.
*United States* v. *E. C. Knight Co.*, 156 U. S. 1, 15, and *Kidd* v.
*Pearson* and *Veazie* v. *Moor*, there cited.   But this bill here
does seek to interfere with that right.   Again, the point here
made is not touched by the line of decisions holding that state
or municipal laws are invalid, which, by taxation or other
regulations, discriminate against merchandise brought from
another State, or seek to prevent interstate commerce therein,
—such as *Welton* v. *Missouri*, 91 U. S. 465; *Walling* v. *Michigan*, 116 U. S. 446; *Minnesota* v. *Barber*, 136 U. S. 313; *Brimmer*
v. *Rebman*, 138 U. S. 78, and *Schollenberger* v. *Pennsylvania*,
171 U. S. 1, 24, 25.

The bill of complaint does not show any contract, combination or conspiracy in restraint of interstate trade or commerce
within the meaning of the Sherman Act.

It does not allege any acts of defendants monopolizing or
attempting to monopolize or combining or conspiring to
monopolize such trade or commerce.

If the act in question be given a construction which would
sustain this bill of complaint, the statute would be unconstitutional.

The alleged offenses complained of are set forth in the sixth,
seventh, eighth, ninth, tenth and eleventh paragraphs of the
bill.   As to the sixth and seventh paragraphs we maintain:
The allegations of combination and conspiracy here are of
mere legal conclusions.   That the purchases of live stock referred to in the sixth and seventh paragraphs, as therein
alleged, are not interstate commerce.

The first paragraph of the bill in which the business of purchasing live stock for slaughter is set forth and described, does not allege or show that the business is interstate commerce.

The description of the live stock in the sixth paragraph, as live stock produced and owned principally in other States and Territories, and shipped by the owners to the places where sold, for sale to persons engaged in producing and dealing in fresh meat, does not show that the sales of the live stock are interstate commerce. The live stock, when offered for sale in the pens of the stock yards, are, under the allegations of fact in the bill, to be considered as having become part of the general mass of property of the State where offered for sale. The defendants purchasing the live stock have the right so to treat and deal therewith. *Brown* v. *Houston,* 114 U. S. 622, 632; *Pittsburgh Coal Co.* v. *Bates,* 156 U. S. 577, 588, 589; *Emert* v. *Missouri,* 120 U. S. 489, 497. When purchased, the live stock is, under the allegations of this bill, at rest for an indefinite time, awaiting sale at its place of destination. *Diamond Match Co.* v. *Ontonagon,* 188 U. S. 82, 92.

The defendants have as much right, then, to treat and deal with and purchase such live stock as an article of domestic commerce as the State has so to treat it for the purposes of taxation or regulation. This bill seeks to interfere with that right under the Sherman Act.

If the sworn allegations of the bill in this respect were to be supplemented by other facts, as matters of common knowledge, with respect to the situation of the live stock when sold, such as appeared in the *Hopkins* and *Anderson* cases, the case of the Government would be no better. It would then appear that the cattle and other live stock are shipped to commission merchants at the stock yards; are then placed in the pens of the stock yards companies, and there held, cared for and fed by the stock yards company for the account of the commission merchants, and under the allegations here it must be taken that their bulk is broken up; they are divided into lots and sold and delivered by the commission merchant as the principal or

owner thereof, and so are not purchased as articles of interstate commerce.

But if these purchases of live stock are interstate commerce, the acts alleged in the sixth and seventh paragraphs are not violations of the Sherman Act. *Hopkins* v. *United States,* 171 U. S. 591; *Anderson* v. *United States,* 171 U. S. 604. They are the exercise of a constitutional right of defendants to control their own business.

There is nothing in the bill to show the proportion of the entire number of head of live stock offered for sale at the markets in question, which is bought by the defendants for the purposes of the production of fresh meat; and so there is nothing to show anything like monopoly or attempt at monopoly of the live stock purchases by the defendants.

There is nothing in the bill to show any attempt on the part of the defendants to control or affect the purchases or business in the purchases of live stock of any other persons than themselves. The alleged combinations by defendants in the sixth and seventh paragraphs charged have to do merely with their own business conduct in themselves buying live stock, or determining how much they shall buy, at private sale for consumption in their own private business.

The combination charged in the sixth paragraph, for directing their respective purchasing agents " to refrain from bidding against each other, except perfunctorily, and without good faith," does not allege a combination to restrain trade; or even a combination to refrain from bidding. A perfunctory bid, made without good faith, is one which the seller could accept and enforce.

The alleged combination in the seventh paragraph, "for bidding up, through their respective purchasing agents, the prices of live stock for a few days at a time at the said stock yards and open markets," does not charge a combination to restrain trade.

These alleged combinations do not have the direct and immediate effect of restraining interstate commerce, but their

effect, if any, upon interstate trade in live stock is indirect and incidental, within the meaning of the decisions of this court. The effect is not near so direct or immediate as the mutual agreement of the traders who were members of the Traders' Exchange in the *Anderson* case.

Obviously the supply of live stock for fresh meat greatly varies in the market at different seasons and times, while the demand for fresh meats for human consumption, for which defendants purchase such live stock, is comparatively constant and uniform.

It is a public benefit and not a public evil that defendants should always be able to supply such constant demand for their fresh meats, and that at the same time they should not over-stock the market with their perishable meats. This makes it proper that they should act with some concert and common understanding in their purchases of live stock for that purpose.

As to the eighth paragraph we contend: The allegation of combination and conspiracy is of a mere legal conclusion, and insufficient. The sales of fresh meats by agents of defendants, as there described, under the facts alleged, are not interstate commerce. But if it be interstate commerce, no violation of the Sherman Act is thereby shown.

No criminal conspiracy is alleged. The charge there is not of a combination or conspiracy to restrain trade (which the statute forbids), but is of a combination or conspiracy to do a lawful act, the exercise of a constitutional right, viz: to raise, lower, fix and maintain their own prices, for their own property, in private sales thereof by themselves. The doing that is not prohibited or made criminal by the Act of Congress.

A criminal conspiracy is an agreement of two or more, either to do an act criminal or unlawful in itself, or to do a lawful act by means which are criminal or unlawful. *Pettibone* v. *United States,* 148 U. S. 203; *Commonwealth* v. *Shedd,* 7 Cush. 514. Here neither the act nor the means alleged are criminal or unlawful. The allegation of intent is immaterial. *Stevenson* v. *Newham,* 13 C. B. 285; *Allen* v. *Flood,* App. Cas. 1.

Again, this point is settled by the ruling in the *Knight Case*, 156 U. S.1,16,that the restraint of trade, if any, which a combination by defendants to raise or lower their own prices would tend to effect would be.an indirect result, and such result would not necessarily determine the object of the contract, combination or conspiracy.

As to the ninth paragraph we contend: The allegation is of a conclusion of law. The cartage as there described is not, under the allegations of the bill, interstate commerce. *State* v. *Knight*, 192 U. S.1,21;*Detroit &c. Ry.* v. *Interstate Comm. Com.*, 74 Fed. Rep. 803, 808; *Hopkins* v. *United States*, 171 U. S. 578, 592. The charge is not of a conspiracy either to do a criminal or unlawful act, or to do by unlawful means the lawful act of fixing their own charges for cartage. Nothing here charged has the direct, immediate or necessary effect to restrain interstate commerce.

As to the tenth paragraph we maintain: The allegation is of a legal conclusion. It also is too indefinite and general. Sufficient facts are not alleged. *United States* v. *Hanley*, 71 Fed. Rep. 672.

A contract or combination among manufacturers or producers of an article which is intended to become the subject of interstate commerce, to raise, lower and fix prices of such article, is not necessarily a contract, combination or conspiracy in restraint of interstate trade or an attempt to monopolize that trade under the Sherman Act. *United States* v. *Nelson*, 52 Fed. Rep. 646; *In re Greene*, 52 Fed. Rep. 104; *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 16; *Gibbs*.v. *McNeeley*, 102 Fed. Rep. 504. See also *Distillery Co.* v. *People*, 156 Illinois, 468; *Glucose Company* v. *Harding*, 182 Illinois, 551.

There was no jurisdiction herein of this charge. No common contract, combination or conspiracy of the defendants with each other is alleged. The allegation that "all and each" have made agreements for less than lawful transportation rates is that they did so acting separately. That was not unlawful on

the part of the defendants; much less was it any violation of the
Sherman Anti Trust Act.    There is here no sufficient showing
of an attempt to monopolize either the interstate transportation
of live stock or fresh meats or interstate trade in live stock or
fresh meats.    The paragraph is multifarious, and there is
therein a misjoinder of causes and parties.

As to the eleventh paragraph we submit that it is too general
and insufficient to require argument.    It is disposed of
by what has been urged as to previous paragraphs.

Prior rulings by this court in cases arising under the Sher-
man Act do not sustain the Government's case here.

With respect to the supposed limitations of the Sherman
Act upon the right of private contract, that act is to be in-
terpreted in the light of the principles of the common law.
*United States* v. *Wong Kim Ark*, 169 U. S. 649; *Moore* v. *United
States*, 91 U. S. 270, 274; *Minor* v. *Happersett*, 21 Wall. 162;
*Ex'parte Wilson*, 114 U. S. 417, 422; *Boyd* v. *United States*, 116
U. S. 616, 624; *Smith* v. *Alabama*, 124 U. S. 465.

The bill of complaint is multifarious; and there is therein a
misjoinder of causes and of parties.    *Walker* v. *Powers*, 104
U. S. 251; *Brown* v. *Guarantee Trust Company*, 128 U. S. 403;
*Zeigler* v. *Lake Street Railway*, 76 Fed. Rep. 662.

The bill is too general and indefinite to require answer.
It does not sufficiently set forth definite or specific facts.

The demurrers to so much of the bill as prays for answer
under oath, and to so much thereof as prays discovery of de-
fendants' books, papers, etc., are well taken.

Rights protected by the Fourth and Fifth Amendments are
thereby infringed.    *United States* v. *Saline Bank*, 1 Pet. 100;
*Boyd* v. *United States*, 116 U. S. 616; *Counselman* v. *Hitchcock*,
142 U. S. 547; *Livingston* v. *Tompkins*, 4 Johns. Ch. 415, 432;
*Entick* v. *Carrington*, 19 Howell's St. Tr. 1029; *S. C.*, 2 Wils.
275; *Huckle* v. *Money*, 2 Wils. 206; Mitford & Tyler's Eq.
Pldg. 289.

*Mr. Attorney General Moody*, with whom *Mr. William A.*

*Day, Assistant to the Attorney General,* was on the brief, for the United States:

The facts show a combination which restrains or monopolizes trade or commerce and operates upon and directly affects interstate or foreign trade or commerce.

The combination or conspiracy which the Government is seeking to destroy and which it was the aim of the petition in this case to set forth is one between all the principal American producers or packers of fresh meats for the purpose of jointly controlling the market for those products throughout the entire United States so as to maintain uniform prices therefor and destroy competition in the sale thereof to dealers and consumers.

The combination set forth in the bill is in restraint of trade, for if in the entire field of the law concerning monopolies and restraints of trade there is a single proposition to which all courts now yield assent, it is that a combination, conspiracy, or agreement between independent manufacturers or producers of a necessary of life to fix and maintain uniform prices for their products, or otherwise to suppress competition with each other, is an unlawful restraint upon trade. *United States* v. *E. C. Knight Co.,* 156 U. S. 1, 16; *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290; *United States* v. *Joint Traffic Association,* 171 U. S. 505; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211; *Northern Securities Co.* v. *United States,* 193 U. S. 197; *Chesapeake & Ohio Fuel Co.* v. *United States,* 115 Fed. Rep. 610; judgments of Lord Bramwell and Lord Hannen in *Mogul S. S. Co.* v. *McGregor,* L. R. App. Cas. (1892) 46, 58; *Morris Run Coal Co.* v. *Barclay Coal Co.,* 68 Pa. St. 155, 173; *Nester et al.* v. *Continental Brewing Co.,* 161 Pa. St. 473; *Salt Co.* v. *Guthrie,* 35 Ohio St. 466; *People* v. *Sheldon,* 139 N. Y. 251; *Cummings* v. *Union Blue Stone Co.,* 164 N. Y. 405; *Trenton Potteries Co.* v. *Olyphant,* 58 N. J. Eq. 507; *Craft* v. *McConoughby,* 79 Illinois, 346; Noyes on Intercorporate Relations, p. 513, note 1, and see the cases collected; and necessarily the means agreed upon to effect the unlawful object of the com-

bination of conspiracy are inseparable parts of the combination or conspiracy itself, and along with it fall within the condemnation of the law.

The combination or conspiracy in controversy operates upon interstate or foreign commerce, and its operations are not confined to commerce carried on wholly within state lines.

The sales of live stock to the defendants and the sales by them of the prepared meats are interstate and not intrastate transactions.

As to what is interstate commerce, see *Gibbons* v. *Ogden*, 9 Wheat. 1, 194; *Northern Securities Co.* v. *United States*, 193 U. S. 197, 337. If interstate commerce is commerce which concerns more States than one, and if a combination of independent producers to suppress competition between its members is a restraint upon commerce, it must follow that a combination of independent producers to fix and control prices and suppress competition between each other in an area covering more States than one is in restraint of interstate commerce and the petition in this case discloses such a combination.

It is impossible to say with even a color of reason that the facts stated in the bill, which cannot be denied, do not show a combination between the defendants to suppress competition between themselves in an area embracing more States than one and it is immaterial to inquire whether the particular purchases and sales made by the defendants are, technically, interstate or intrastate transactions. There is nothing unreasonable or novel in the conclusion that a combination may restrain interstate commerce, although the individual transactions of its members might, standing alone and viewed separate and apart from the purpose and necessary effect of the whole combination, be intrastate in character. *Montague & Co.* v. *Lowry*, 193 U. S. 38. The character of a combination —that is, whether or not it is interstate in its operation—is decided, not by the nature of the particular transactions of its individual members, but by the extent of the territory in which it operates—in which it controls prices and sales and

suppresses competition.   If that territory embraces more States than one the combination restrains interstate commerce. *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211, 240.

Whether a combination in restraint of trade operates upon interstate or only intrastate commerce does not depend upon whether the individual transactions of its members, standing alone and viewed separate and apart from the purpose and necessary effect of the whole combination, are interstate or intrastate in character, and the petition here discloses a combination which operates upon *interstate* commerce; for whatever may be the character of the individual transactions of its several members, it is also true in this case that the individual transactions of the members of the combination do fall within the jurisdiction conferred upon Congress by the commerce clause of the Constitution.   These transactions consist of the defendants' purchases of live stock; the sales and shipments of fresh meats made directly by the defendants to dealers and consumers in the several States, and the sales of fresh meats to dealers and consumers in the several States by agents of the defendants located in those States.

From all over the stock-raising section, embracing many different States, cattle, sheep and hogs are habitually shipped to the great live-stock markets at Chicago, Omaha, Sioux City, St. Joseph, Kansas City, East St. Louis and St. Paul for sale, to those, the defendants chief among them, engaged in the business of converting live stock into fresh meats for human consumption.   The shipments are made with the express and sole purpose of sale as soon as market conditions will permit, and the sales are made while the cattle yet remain in first hands, that is, in the hands of the owners or their agents, and in the ordinary form or condition in which cattle are shipped from one country or State to another, which is analogous to the form or condition of the original package in the case of merchandise. *Austin* v. *Tennessee*, 179 U. S. 343, 359.

The cattle are not dealt with in a commercial way from the time of their arrival until their sale to the defendants and others, but are simply fed and cared for. No act is done with reference to them that would cause them to become mixed with the general mass of local property. Now, it may be that a distinction should be made between what may be called an interstate sale proper and in the full sense of the term—that is, a sale between persons negotiating and dealing from two or more different States, and a sale, at its destination and while it still remains in the original state or package, of an article of commerce sent from another State. But so far as the result in this instance is concerned it is a distinction without a difference. If the sales of live stock set forth in the petition do not fall within the first of these classes they certainly fall within the second, and that brings them within the protection of the Federal power over commerce and therefore within the protection of the Anti Trust Act; for the right to transport articles of commerce from one State to another includes the right of the owner or consignee to sell them in the latter free from any burden or restraint that the States might attempt to impose. *Brown* v. *Maryland*, 12 Wheat. 419; *Bowman* v. *Chicago and Northwestern Railway Co.*, 125 U. S. 465; *Leisy* v. *Hardin*, 135 U. S. 100; *Rhodes* v. *Iowa*, 170 U. S. 412, and, *a fortiori*, free from any burden or restraint that a combination of individuals might attempt to impose. *In re Debs*, 158 U. S. 564, 581; *Hopkins* v. *United States*, 171 U. S. 578, 590.

Paragraph 2 of the bill contains matter of description and inducement, and must be read in conjunction with the stating part of the petition, which alleges, *inter alia*, that "in order to restrain and destroy competition among themselves" the defendants have engaged in a "combination and conspiracy to arbitrarily from time to time raise, lower, and fix prices, and to maintain uniform prices at which they will sell, directly or through their respective agents, such fresh meats to dealers and consumers throughout the said States and Territories and the District of Columbia and foreign countries."

As the sales made directly by the defendants to dealers and consumers throughout the United States are interstate sales, and as decisions of this court have settled that a combination to control and suppress competition in such sales is a combination in restraint of interstate commerce, the petition in this case, having shown that much, cannot in any event be dismissed, even should it be held to have failed in all other respects.

Paragraph 3 of the petition states that the defendants are engaged in shipping fresh meats from their plants in certain States to their respective agents at and near the principal markets in other States and Territories for sale by such agents to dealers and consumers in those States and Territories. Upon the question whether or not the sales made by these agents under the circumstances set forth are within the body of interstate commerce, there is nothing to add to the cogent argument in the opinion of the circuit judge.

The bill is not multifarious and does not disclose a misjoinder of parties. 14 Ency. of Pl. and Pr. 198; 1 Bates Fed. Eq. Pro. §§ 135, 195. The Circuit Court did not err in sustaining the demurrers to the bill in its aspect as a bill of discovery. The demurrers are demurrers to the whole bill. *Livingston* v. *Story,* 9 Pet. 632, 654.

The well-settled rule of equity pleading is that a demurrer to a whole bill cannot be sustained as to part of the bill and overruled as to part, but must be overruled as to the whole if any part of the bill is good and entitles the complainant to any relief. Fletcher, Eq. Pl. §§ 203, 204; Story, Eq. Pl., 10th ed., §§ 443, 444; *Parker* v. *Simpson,* 62 N. E. Rep. (Mass.) 401; *Metler's Admn's.* v. *Metler,* 18 N. J. Eq. 270, 273. When the defendants leveled their demurrers at the relief as well as the discovery, instead of answering as to the relief and demurring as to the discovery they did so at their peril. Daniell's Chan. Prac., 3d Am. ed., 568–608; see also Acts of Congress of February 25, 1903, 32 Stat. 903; of February 11, 1893, 27 Stat. 443, and *Interstate Comm. Com.* v. *Baird,* 194 U. S. 25, 44,

citing *Brown* v. *Walker*, 161 U. S. 591; *Boyd* v. *United States*, 116 U. S. 616.

Judges have differed as to the validity of aggregations of capital effected by some form of organic union between several smaller and competing corporations, and economists are far from agreeing that such aggregations, within limitations, are hurtful. So too, associations of manufacturers to regulate competition within a restricted area have not always been condemned by courts and have sometimes been approved by publicists. But as yet no responsible voice has been heard to justify, legally or economically, a conspiracy or agreement between nearly all the producers of a commodity necessary to life by which the confederates acquire absolute control and dominion over the production, sale and distribution of that commodity throughout the entire territory of a nation, with the power, at will, to raise prices to the consumer of the finished product and lower prices to the producer of the raw material. Yet such is that now at the bar of this court. That there is a conspiracy to control the market of the nation for fresh meats, that it does control it, and that its control is merciless and oppressive, are facts known of all men. The broad question here is, Does the Government's petition, with its statements of fact standing unchallenged, discover that conspiracy to the court? We submit that it does and that the decree of the Circuit Court should in all things be affirmed.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court, on demurrer, granting an injunction against the appellants' commission of alleged violations of the act of July 2, 1890, c. 647, 26 Stat. 209, "to protect trade and commerce against unlawful restraints and monopolies." It will be necessary to consider both the bill and the decree. The bill is brought against a number of corporations, firms and individuals of different States and makes the following allegations: 1. The defend-

ants (appellants) are engaged in the business of buying live stock at the stock yards in Chicago, Omaha, St. Joseph, Kansas City, East St. Louis and St. Paul, and slaughtering such live stock at their respective plants in places named, in different States, and converting the live stock into fresh meat for human consumption. 2. The defendants "are also engaged in the business of selling such fresh meats, at the several places where they are so prepared, to dealers and consumers in divers States and Territories of the said United States other than those wherein the said meats are so prepared and sold as aforesaid, and in the District of Columbia, and in foreign countries, and shipping the same meats, when so sold from the said places of their preparation, over the several lines of transportation of the several railroad companies serving the same as common carriers, to such dealers and consumers, pursuant to such sales." 3. The defendants also are engaged in the business of shipping such fresh meats to their respective agents at the principal markets in other States, etc., for sale by those agents in those markets to dealers and consumers. 4. The defendants together control about six-tenths of the whole trade and commerce in fresh meats among the States, Territories and District of Columbia, and, 5, but for the acts charged would be in free competition with one another.

6. In order to restrain competition among themselves as to the purchase of live stock, defendants have engaged in, and intend to continue, a combination for requiring and do and will require their respective purchasing agents at the stock yards mentioned, where defendants buy their live stock (the same being stock produced and owned principally in other States and shipped to the yards for sale), to refrain from bidding against each other, "except perfunctorily and without good faith," and by this means compelling the owners of such stock to sell at less prices than they would receive if the bidding really was competitive.

7. For the same purposes the defendants combine to bid up, through their agents, the prices of live stock for a few days at

a time, "so that the market reports will show prices much higher than the state of the trade will warrant," thereby inducing stock owners in other States to make large shipments to the stock yards to their disadvantage.

8. For the same purposes, and to monopolize the commerce protected by the statute, the defendants combine "to arbitrarily, from time to time raise, lower, and fix prices, and to maintain uniform prices at which they will sell" to dealers throughout the States. This is effected by secret periodical meetings, where are fixed prices to be enforced until changed at a subsequent meeting. The prices are maintained directly, and by collusively restricting the meat shipped by the defendants, whenever conducive to the result, by imposing penalties. for deviations, by establishing a uniform rule for the giving of credit to dealers, etc., and by notifying one another of the delinquencies of such dealers and keeping a black list of delinquents, and refusing to sell meats to them.

9. The defendants also combine to make uniform charges for cartage for the delivery of meats sold to dealers and consumers in the markets throughout the States, etc., shipped to them by the defendants through the defendants' agents at the markets, when no charges would have been made but for the combination.

10. Intending to monopolize the said commerce and to prevent competition therein, the defendants "have all and each engaged in and will continue" arrangements with the railroads whereby the defendants received, by means of rebates and other devices, rates less than the lawful rates for transportation, and were exclusively to enjoy and share this unlawful advantage to the exclusion of competition and the public. By force of the consequent inability of competitors to engage or continue in such commerce, the defendants are attempting to monopolize, have monopolized, and will monopolize the commerce in live stock and fresh meats among the States and Territories, and with foreign countries, and, 11, the defendants are and have been in conspiracy with each other, with

the railroad companies and others unknown, to obtain a monopoly of the supply and distribution of fresh meats throughout the United States, etc.   And to that end defendants artificially restrain the commerce and put arbitrary regulations in force affecting the same from the shipment of the live stock from the plains to the final distribution of the meats to the consumers.   There is a prayer for an injunction of the most comprehensive sort, against all the foregoing proceedings and others, for discovery of books and papers relating directly or indirectly to the purchase or shipment of live stock, and the sale or shipment of fresh meat, and for an answer under oath. The injunction issued is appended in a note.[1]

---

[1] "And now, upon motion of the said attorney, the court doth order that the preliminary injunction heretofore awarded in this cause, to restrain the said defendants and each of them, their respective agents and attorneys, and all other persons acting in their behalf, or in behalf of either of them, or claiming so to act, from entering into, taking part in, or performing any contract, combination or conspiracy, the purpose or effect of which will be, as to trade and commerce in fresh meats between the several States and Territories and the District of Columbia, a restraint of trade, in violation of the provisions of the act of Congress approved July 2, 1890, entitled 'An act to protect trade and commerce against unlawful restraints and monopolies,' either by directing or requiring their respective agents to refrain from bidding against each other in the purchase of live stock; or collusively and by agreement to refrain from bidding against each other at the sales of live stock; or by combination, conspiracy or contract raising or lowering prices or fixing uniform prices at which the said meats will be sold, either directly or through their respective agents; or by curtailing the quantity of such meats shipped to such markets and agents; or by establishing and maintaining rules for the giving of credit to dealers in such meats, the effect of which rules will be to restrict competition; or by imposing uniform charges for cartage and delivery of such meats to dealers and consumers, the effect of which will be to restrict competition; or by any other method or device, the purpose and effect of which is to restrain commerce as aforesaid; and also from violating the provisions of the act of Congress approved July 2, 1890, entitled 'An act to protect trade and commerce against unlawful restraints and monopolies,' by combining or conspiring together, or with each other and others, to monopolize or attempt to monopolize any part of the trade and commerce in fresh meats among the several States and Territories and the District of Columbia, by demanding, obtaining, or, with or without the connivance of the officers or agents thereof, or of any of them, receiving from railroad companies or other common carriers transporting such fresh meats

To sum up the bill more shortly, it charges a combination of a dominant proportion of the dealers in fresh meat throughout the United States not to bid against each other in the live stock markets of the different States, to bid up prices for a few days in order to induce the cattle men to send their stock to the stock yards, to fix prices at which they will sell, and to that end to restrict shipments of meat when necessary, to establish a uniform rule of credit to dealers and to keep a black list, to make uniform and improper charges for cartage, and finally, to get less than lawful rates from the railroads to the exclusion of competitors. It is true that the last charge is not clearly stated to be a part of the combination. But as it is alleged that the defendants have each and all made arrangements with the railroads, that they were exclusively to enjoy the unlawful advantage, and that their intent in what they did was to monopolize the commerce and to prevent competition, and in view of the general allegation to which we

in such trade and commerce, either directly or by means of rebates, or by any other device, transportation of or for such means, from the points of the preparation and production of the same from live stock or elsewhere, to the markets for the sale of the same to dealers and consumers in other States and Territories than those wherein the same are so prepared, or the District of Columbia, at less than the regular rates which may be established or in force on their several lines of transportation, under the provisions in that behalf of the laws of the said United States for the regulation of commerce, be and the same is hereby made perpetual.

"But nothing herein shall be construed to prohibit the said defendants from agreeing upon charges for cartage and delivery, and other incidents connected with local sales, where such charges are not calculated to have any effect upon competition in the sales and delivery of meats; nor from establishing and maintaining rules for the giving of credit to dealers where such rules in good faith are calculated solely to protect the defendants against dishonest or irresponsible dealers, nor from curtailing the quantity of meats shipped to a given market where the purpose of such arrangement in good faith is to prevent the over-accumulation of meats as perishable articles in such markets.

"Nor shall anything herein contained be construed to restrain or interfere with the action of any single company or firm, by its or their officers or agents (whether such officers or agents are themselves personally made parties defendant hereto or not) acting with respect to its or their own corporate or firm business, property or affairs."

shall refer, we think that we have stated correctly the purport of the bill. It will be noticed further that the intent to monopolize is alleged for the first time in the eighth section of the bill as to raising, lowering and fixing prices. In the earlier sections, the intent alleged is to restrain competition among themselves. But after all the specific charges there is a general allegation that the defendants are conspiring with one another, the railroads and others, to monopolize the supply and distribution of fresh meats throughout the United States, etc., as has been stated above, and it seems to us that this general allegation of intent colors and applies to all the specific charges of the bill. Whatever may be thought concerning the proper construction of the statute, a bill in equity is not to be read and construed as an indictment would have been read and construed a hundred years ago, but it is to be taken to mean what it fairly conveys to a dispassionate reader by a fairly exact use of English speech. Thus read this bill seems to us intended to allege successive elements of a single connected scheme.

We read the demurrer with the same liberality. Therefore we take it as applying to the bill generally for multifariousness and want of equity, and also to each section of it which makes a charge and to the discovery. The demurrer to the discovery will not need discussion in the view which we take concerning the relief, and therefore we turn at once to that.

The general objection is urged that the bill does not set forth sufficient definite or specific facts. This objection is serious, but it seems to us inherent in the nature of the case. The scheme alleged is so vast that it presents a new problem in pleading. If, as we must assume, the scheme is entertained, it is, of course, contrary to the very words of the statute. Its size makes the violation of the law more conspicuous, and yet the same thing makes it impossible to fasten the principal fact to a certain time and place. The elements, too, are so numerous and shifting, even the constituent parts alleged are and from their nature must be so extensive in time

and space, that something of the same impossibility applies to them. The law has been upheld, and therefore we are bound to enforce it notwithstanding these difficulties. On the other hand, we equally are bound by the first principles of justice not to sanction a decree so vague as to put the whole conduct of the defendants' business at the peril of a summons for contempt. We cannot issue a general injunction against all possible breaches of the law. We must steer between these opposite difficulties as best we can.

The scheme as a whole seems to us to be within reach of the law. The constituent elements, as we have stated them, are enough to give to the scheme a body and, for all that we can say, to accomplish it. Moreover, whatever we may think of them separately when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme. It is suggested that the several acts charged are lawful and that intent can make no difference. But they are bound together as the parts of a single plan. The plan may make the parts unlawful. *Aikens* v. *Wisconsin,* 195 U. S. 194, 206. The statute gives this proceeding against combinations in restraint of commerce among the States and against attempts to monopolize the same. Intent is almost essential to such a combination and is essential to such an attempt. Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. *Commonwealth* v. *Peaslee,* 177 Massachusetts, 267, 272. But when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result. What we have said disposes incidentally of the objection to the bill as multifarious. The unity of the plan embraces all the parts.

One further observation should be made. Although the

combination alleged embraces restraint and monopoly of trade within a single State, its effect upon commerce among the States is not accidental, secondary, remote or merely probable. On the allegations of the bill the latter commerce no less, perhaps even more, than commerce within a single State is an object of attack. See *Leloup* v. *Port of Mobile*, 127 U. S. 640, 647; *Crutcher* v. *Kentucky*, 141 U. S. 47, 59; *Allen* v. *Pullman Co.*, 191 U. S. 171, 179, 180. Moreover, it is a direct object, it is that for the sake of which the several specific acts and courses of conduct are done and adopted. Therefore the case is not like *United States* v. *E. C. Knight Co.*, 156 U. S. 1, where the subject matter of the combination was manufacture and the direct object monopoly of manufacture within a State. However likely monopoly of commerce among the States in the article manufactured was to follow from the agreement it was not a necessary consequence nor a primary end. Here the subject matter is sales and the very point of the combination is to restrain and monopolize commerce among the States in respect of such sales. The two cases are near to each other, as sooner or later always must happen where lines are to be drawn, but the line between them is distinct. *Montague & Co.* v. *Lowry*, 193 U. S. 38.

So, again, the line is distinct between this case and *Hopkins* v. *United States*, 171 U. S. 578. All that was decided there was that the local business of commission merchants was not commerce among the States, even if what the brokers were employed to sell was an object of such commerce. The brokers were not like the defendants before us, themselves the buyers and sellers. They only furnished certain facilities for the sales. Therefore, there again the effects of the combination of brokers upon the commerce was only indirect and not within the act. Whether the case would have been different if the combination had resulted in exorbitant charges, was left open. In *Anderson* v. *United States*, 171 U. S. 604, the defendants were buyers and sellers at the stock yards, but their agreement was merely not to employ brokers, or to

recognize yard-traders, who were not members of their association. Any yard-trader could become a member of the association on complying with the conditions, and there was said to be no feature of monopoly in the case. It was held that the combination did not directly regulate commerce between the States, and, being formed with a different intent, was not within the act. The present case is more like *Montague & Co.* v. *Lowry*, 193 U. S. 38.

For the foregoing reasons we are of opinion that the carrying out of the scheme alleged, by the means set forth, properly may be enjoined, and that the bill cannot be dismissed.

So far it has not been necessary to consider whether the facts charged in any single paragraph constitute commerce among the States or show an interference with it. There can be no doubt, we apprehend, as to the collective effect of all the facts, if true, and if the defendants entertain the intent alleged. We pass now to the particulars, and will consider the corresponding parts of the injunction at the same time. The first question arises on the sixth section. That charges a combination of independent dealers to restrict the competition of their agents when purchasing stock for them in the stock yards. The purchasers and their slaughtering establishments are largely in different States from those of the stock yards, and the sellers of the cattle, perhaps it is not too much to assume, largely in different States from either. The intent of the combination is not merely to restrict competition among the parties, but, as we have said, by force of the general allegation at the end of the bill, to aid in an attempt to monopolize commerce among the States.

It is said that this charge is too vague and that it does not set forth a case of commerce among the States. Taking up the latter objection first, commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one State, with the expectation that they will end their transit, after purchase, in another, and when in effect

they do .so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the States, and the purchase of the cattle is a part and incident of such commerce. What we say is true at least of such a purchase by residents in another State from that of the seller and of the cattle. And we need not trouble ourselves at this time as to whether the statute could be escaped by any arrangement as to the place where the sale in point of law is consummated. See *Norfolk & Western Ry.* v. *Sims*, 191 U. S. 441. But the sixth section of the bill charges an interference with such sales, a restraint of the parties by mutual contract and a combination not to compete in order to monopolize. It is immaterial if the section also embraces domestic transactions.

It should be added that the cattle in the stock yard are not at rest even to the extent that was held sufficient to warrant taxation in *American Steel & Wire Co.* v. *Speed*, 192 U. S. 500. But it may be that the question of taxation does not depend upon whether the article taxed may or may not be said to be in the course of commerce between the States, but depends upon whether the tax so far affects that commerce as to amount to a regulation of it. The injunction against taking part in a combination, the effect of which will be a restraint of trade among the States by directing the defendants' agents to refrain from bidding against one another at the sales of live stock, is justified so far as the subject matter is concerned.

The injunction, however, refers not to trade among the States in cattle, concerning which there can be no question of original packages, but to trade in fresh meats, as the trade forbidden to be restrained, and it is objected that the trade in fresh meats described in the second and third sections of the bill is not commerce among the States, because the meat is sold at the slaughtering places, or when sold elsewhere may be sold in less than the original packages. But the allegations of the second section, even if they import a technical passing

of title at the slaughtering places, also import that the sales
are to persons in other States, and that the shipments to other
States are part of the transaction—"pursuant to such sales"—
and the third section imports that the same things which are
sent to agents are sold by them, and sufficiently indicates that
some at least of the sales are of the original packages. More-
over, the sales are by persons in one State to persons in another.
But we do not mean to imply that the rule which marks the
point at which state taxation or regulation becomes per-
missible necessarily is beyond the scope of interference by
Congress in cases where such interference is deemed necessary
for the protection of commerce among the States. Nor do we
mean to intimate that the statute under consideration is
limited to that point. Beyond what we have said above, we
leave those questions as we find them. They were touched
upon in the *Northern Securities Company's Case*, 193 U. S. 197.

We are of opinion, further, that the charge in the sixth sec-
tion is not too vague. The charge is not of a single agreement
but of a course of conduct intended to be continued. Under
the act it is the duty of the court, when applied to, to stop the
conduct. The thing done and intended to be done is perfectly
definite: with the purpose mentioned, directing the defendants'
agents and inducing each other to refrain from competition in
bids. The defendants cannot be ordered to compete, but they
properly can be forbidden to give directions or to make agree-
ments not to compete. See *Addyston Pipe & Steel Co.* v.
*United States*, 175 U. S. 211. The injunction follows the charge.
No objection was made on the ground that it is not confined
to the places specified in the bill. It seems to us, however,
that it ought to set forth more exactly the transactions in
which such directions and agreements are forbidden. The
trade in fresh meat referred to should be defined somewhat
as it is in the bill, and the sales of stock should be confined to
sales of stock at the stock yards named, which stock is sent
from other States to the stock yards for sale or is bought at
those yards for transport to another State.

After what we have said, the seventh, eighth and ninth sections need no special remark, except that the cartage referred to in section nine is not an independent matter, such as was dealt with in *Pennsylvania R. R. Co.* v. *Knight,* 192 U. S. 21, but a part of the contemplated transit—cartage for delivery of the goods. The general words of the injunction "or by any other method or device, the purpose and effect of which is to restrain commerce as aforesaid," should be stricken out. The defendants ought to be informed as accurately as the case permits what they are forbidden to do. Specific devices are mentioned in the bill, and they stand prohibited. The words quoted are a sweeping injunction to obey the law, and are open to the objection which we stated at the beginning that it was our duty to avoid. To the same end of definiteness so far as attainable, the words "as charged in the bill," should be inserted between "dealers in such meats," and "the effect of which rules," and two lines lower, as to charges for cartage, the same words should be inserted between "dealers and consumers" and "the effect of which."

The acts charged in the tenth section, apart from the combination and the intent, may, perhaps, not necessarily be unlawful, except for the adjective which proclaims them so. At least we may assume, for purposes of decision, that they are not unlawful. The defendants, severally, lawfully may obtain less than the regular rates for transportation if the circumstances are not substantially similar to those for which the regular rates are fixed. Act of Feb. 4, 1887, c. 104, § 2, 24 Stat. 379. It may be that the regular rates are fixed for carriage in cars furnished by the railroad companies, and that the defendants furnish their own cars and other necessities of transportation. We see nothing to hinder them from combining to that end. We agree, as we already have said, that such a combination may be unlawful as part of the general scheme set forth in the bill, and that this scheme as a whole might be enjoined. Whether this particular combination can be enjoined, as it is, apart from its connection with the other

elements, if entered into with the intent to monopolize, as alleged, is a more delicate question. The question is how it would stand if the tenth section were the whole bill. Not every act that may be done with intent to produce an unlawful result is unlawful, or constitutes an attempt. It is a question of proximity and degree. The distinction between mere preparation and attempt is well known in the criminal law. *Commonwealth* v. *Peaslee*, 177 Massachusetts, 267, 272. The same distinction is recognized in cases like the present. *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 13; *Kidd* v. *Pearson*, 128 U. S. 1, 23, 24. We are of opinion, however, that such a combination is within the meaning of the statute. It is obvious that no more powerful instrument of monopoly could be used than an advantage in the cost of transportation. And even if the advantage is one which the act of 1887 permits, which is denied, perhaps inadequately, by the adjective "unlawful," still a combination to use it for the purpose prohibited by the act of 1890 justifies the adjective and takes the permission away.

It only remains to add that the foregoing question does not apply to the earlier sections, which charge direct restraints of trade within the decisions of the court, and that the criticism of the decree, as if it ran generally against combinations in restraint of trade or to monopolize trade, ceases to have any force when the clause against "any other method or device" is stricken out. So modified it restrains such combinations only to the extent of certain specified devices, which the defendants are alleged to have used and intend to continue to use.

*Decree modified and affirmed.*