MARTIN et al. v. BOULDIN FRUIT CO. et al.

No. 31212. June 10, 1947.

*181 P. 2d 995.*

Paul L. Washington and Albert D. Lynn, both of Oklahoma City, for plaintiffs in error.

Cheek, Gibson, Savage & Benefield, James Alex Cheek, and John D. Cheek, all of Oklahoma City, for defendants in error.

ARNOLD, J. This is an appeal from an order sustaining the demurrer of defendant in error, defendant below, to the evidence of plaintiff in error in an action wherein plaintiff sought to recover compensation for alleged overtime work performed by him under the provisions of the Fair Labor Standards Act of 1938. 29 U.S.C.A. § 201 et seq. One Alfred Canada was a party plaintiff but he does not appeal and is not a party plaintiff in error. Plaintiff commenced this action against the Bouldin Fruit Company, a corporation, and M. H. Stephens Produce Company, a corporation. The case was tried to the court without a jury and at the close of plaintiff's evidence defendants demurred separately to plaintiff's evidence. The demurrer of the Bouldin Fruit Company was sustained and plaintiff admitted in open court that the demurrer of that defendant was well taken.

Defendant was engaged in the operation of a wholesale fruit and vegetable business in Oklahoma City; plaintiff alleges that defendant maintained a warehouse where it received and stored its goods and merchandise, received both from intrastate and interstate shipments; that from October 24, 1938, to September 24, 1939, plaintiff was employed by said defendant; that his duties were loading and unloading all fruit and vegetables from railway cars and trucks, work in the warehouse, driving delivery trucks and the like; that plaintiff was employed in commerce and the production of goods for

commerce within the meaning of the Fair Labor Standards Act of 1938; that during said period he was paid for a work week of 51 hours at a wage of $18.02 per week, which was in excess of the maximum weekly hours allowable under said act and that he was not paid one and one-half times the regular rate of pay for such excess hours; that his regular rate of pay was 33¢ per hour, and overtime pay would be at the rate of 50¢ per hour; that during said period plaintiff worked overtime a total of about 870 hours, which would amount to $452.78; that he was entitled to said sum and an additional equal amount as liquidated damages and a reasonable attorney's fee.

The evidence shows that defendant's business was that of selling at wholesale fruit and vegetables to retail dealers within the State of Oklahoma. There is no evidence that defendant ever sold or shipped any merchandise outside of the State of Oklahoma.

Plaintiff testified in substance that during the month of October, 1938, he was working as a warehouseman; that shortly thereafter he drove a delivery truck delivering orders to retail dealers in Oklahoma City and some nearby towns; that during the period involved he went to work every morning about 4 o'clock; that from 4 o'clock to about 6:30 a. m. he worked in the warehouse putting up orders for the day's delivery, from about 6:30 a. m. until 12 o'clock noon he drove the truck making deliveries, and from about 1 o'clock p. m. until he quit work in the evening, 6 to 9 p. m., he "worked in the warehouse unloading cars and trucks and rearranging merchandise and whatever there was to do"; that defendant sometimes had three or four cars at a time at the warehouse to be unloaded; that occasionally he would help unload a car at other sidings; that defendant handled fruits and vegetables shipped in cars or trucks from all over the country and from several different states; that some produce was bought locally.

Plaintiff testified that he and his wife kept a record of the number of hours plaintiff worked every day. This record was introduced in evidence and plaintiff's wife testified that she made the entries correctly as directed by the plaintiff.

On cross-examination plaintiff was asked as to the manner in which carload shipments received by defendant were handled upon arrival. The questions and answers relating to this are as follows:

"Q. Now, when the seal was broken, Bouldin would inspect the car to see whether he would accept it or not, wouldn't he? A. Yes, sir. Q. Then if he accepted it, and not until he did accept it, would he undertake to unload it, isn't that true? Yes, sir. Q. Now, these cars were then delivered to Bouldin for unloading after he had accepted them, that was always true, wasn't it? A. Yes, sir."

It is disclosed by the record in this case that the shipments of fruit and vegetables received by defendant were not for the purpose of filling orders previously placed by local customers for specific goods or quantities thereof, but that such shipments, when received, constituted defendant's wholesale stock in trade from which he filled orders as they came in. As a matter of fact, as testified to by plaintiff, these carload shipments were never spotted for unloading at defendant's warehouse until after the seals on the car had been broken, the contents inspected and the shipments accepted by defendant.

After title to the various shipments had become vested in defendant by inspection and acceptance of the contents of the cars and after delivery had been accomplished by the spotting of the opened cars on the warehouse siding, the defendant used the cars as adjuncts to its warehouse during the free time granted for unloading before demurrage attached. The activities of plaintiff and the other employees of defendant in unloading the shipments, previously

accepted by and delivered to defendant, were merely steps taken in the preparation of the merchandise for local distribution to retail dealers when orders should be received and accepted therefor. A situation similar to this, so far as the application of legal principles is concerned, was considered by the Supreme Court of California in the case of McDaniel et al. v. Clavin, 22 Cal. A. 61, 136 P. 2d 559. In that case the wholesaler was engaged in the poultry business and when he had inspected and accepted a shipment of poultry the same was placed in cold storage to await the needs of his business. The plaintiff in that case was a general employee, just as was the plaintiff in the case at bar, and his claim for overtime compensation was based on his activities in transferring this poultry from the cold storage plant to the place of business of his employer, where it was prepared for local distribution. In denying the applicability of the Fair Labor Standards Act to the claim of plaintiff in that case the California court said:

"The evidence shows that defendant used the cold-storage warehouse as an adjunct to his plant, and that the poultry was left there until taken to meet the needs of local customers. Plaintiff's activity in taking the poultry from the warehouse was simply a step in the local distribution of the poultry and is not covered by the act."

This court, in the case of Brooks Packing Co. v. Willis, 192 Okla. 538, 137 P. 2d 923, considered a claim somewhat similar to the claim of plaintiff in the instant case, the facts therein making applicable the rule of construction applied in this case. In the third paragraph of the syllabus this court used the following language:

"Defendant, operator of a wholesale establishment, purchased certain commodities outside of the state for sale to retail trade within the state. In an action by plaintiff, employee of defendant, to recover the minimum wages fixed by the Fair Labor Standards Act, supra, it was shown that plaintiff's duties consisted of packing said commodities and shipping the same to the retail trade, but there was no showing that said goods had not acquired a fixed situs within the state and were not held for local disposition or use. *Held,* that plaintiff failed to sustain the burden of proof that he was engaged in interstate commerce within the meaning of the act, or in the production of goods for interstate commerce."

The cases of Walling v. Jacksonville Paper Co., 317 U. S. 564, 87 L. Ed. 460, and Higgins v. Carr Bros. Co., 317 U. S. 572, 87 L. Ed. 468, were decided the same day, both opinions being written by the same Justice of the Supreme Court. In distinguishing the latter case from the former, it is said in the body of the opinion:

"Petitioner in his brief describes the business in somewhat greater detail and seeks to show an actual or practical continuity of movement of merchandise from without the state to respondent's regular customers within the state. But here, unlike Walling v. Jacksonville Paper Co., there is nothing in the record before us to support those statements. . . ."

This language of the court evidently referred to the first and second phases of the opinion in the Jacksonville Paper Co. Case because as to the transactions embraced in the third phase of that opinion its holding was the same as in the Higgins Case.

The Jacksonville Paper Company maintained twelve branches. The business done by five of these branches consisted of orders received from and deliveries made across state lines. These five branches and the business conducted by them were summarily disposed of as being clearly within the terms of the act. The business and transactions of the remaining seven branches were considered and discussed in the opinion under three phases or categories, the first two being held to come within the terms of the act while the third was held not to be so covered. The first group of transactions is thus

described in the language of the opinion:

"Some of this merchandise is shipped direct from the mills to respondent's customers. Some of it is purchased on special orders from customers, consigned to the branches, taken from the steamship or railroad terminal to the branches for checking, and then taken to the customer's place of business. The bulk of the merchandise, however, passes through the branch warehouses before delivery to customers. . . . Frequently orders for stock items whose supply is exhausted are received. Respondent orders the merchandise and delivers it to the customer as soon as possible. Apparently many of these orders are treated as deliveries from stock in trade. Not all items listed in respondent's catalogue are carried in stock but are stocked at the mill. Orders for these are filled by respondent from the manufacturer or supplier. . . ."

The second group of transactions was thus described in the opinion:

". . . Thus it is shown that there is a variety of items printed at the mill with the name of the customer. It is also established that there are deliveries of certain goods which are obtained from the manufacturer or supplier to meet the needs of specified customers. Among the latter are certain types of newsprint, paper, ice cream cups, and cottage cheese containers. The record reveals, however, that the goods in both of these two categories are ordered pursuant to a pre-existing contract or understanding with the customer. . . ."

It was clearly within one or the other of these two categories that the petitioner in the Higgins Case sought to bring his activities, but the court held that he had not sustained the burden of proof resting upon him to establish that necessary activity on his part. The third phase of the opinion in the Jacksonville Paper Company Case is thus stated by the court:

"Finally, the administrator contends that most of the customers form a fairly stable group, that their orders are recurrent as to the kind and amount of merchandise, and that the manager can estimate with considerable precision the needs of his trade. It is therefore urged that the business with these customers is 'in commerce' within the meaning of the act. Some of the instances to which we are referred are situations which we have discussed in connection with goods delivered pursuant to a prior order, contract, or understanding. For the reasons stated they must be included in the group of transactions held to be 'in commerce.' As to the balance, we do not think the administrator has sustained the burden which is on a petitioner of establishing error in a judgment which we are asked to set aside. We do not mean to imply that a wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts, might not at times be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce' within the meaning of the act. It was said in Swift & Co. v. United States, 196 U. S. 375, 398, 49 L. Ed. 518, 525, 25 S. Ct. 276, that 'commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business.' While that observation was made apropos of the constitutional scope of the commerce power, it is equally apt as a starting point for inquiry, whether a particular business is 'in commerce' within the meaning of this act. We do not believe, however, that on this phase of the case such a course of business is revealed by this record. The evidence said to support it is of a wholly general character and lacks that particularity necessary to show that the goods in question were different from goods acquired and held by a local merchant for local disposition.

"In this connection we cannot be unmindful that Congress in enacting this statute plainly indicated its purpose to leave local business to the protection of the states."

The similarity of the language used by the court with reference to the claim of the administrator in the Jacksonville Paper Company Case, to wit:

"We do not think the administrator has sustained the burden which is on a petitioner of establishing error in a

judgment which we are asked to set aside"

—with the language of the court in disposing of the claim of petitioner in the Higgins Case, to wit:

"Petitioner has not maintained the burden of showing error in the judgment which he asks us to set aside"

—is obvious. Both statements by the court have reference to similar claims of the petitioner in each case as to the character of activities which he claimed made the terms of the act applicable.

The third headnote of the Jacksonville Paper Company opinion and the first headnote to the Higgins opinion are very similar and epitomize the reasoning and conclusion of the court upon the last phase of the Jacksonville Paper Company Case.

Prior to the decision by the Tenth Circuit Court of Appeals in the Jewel Tea Company Case (118 Fed. 2d 202), there was division of opinion among Federal trial courts as to whether employees engaged in unloading interstate shipments after receipt and acceptance thereof by their employer were angaged in interstate activities. Grand Union Tea Co. v. Evans (D.C.) 216 Fed. 791; Lewis v. Nailing, 36 Fed. Supp. 187; Fleming v. Alterman, 30 Fed. Supp. 94; Klotz v. Ippolite, 40 Fed. Supp. 422. The Jewel Tea Company Case was followed by the Fifth Circuit Court of Appeals in the Jax Beer Company Case (124 Fed. 2d 172) and by the Seventh Circuit Court of Appeals in the General Tobacco Company Case (125 Fed. 2d 596). These decisions, with that in the Higgins Case, supra, have resulted in more uniformity of decisions among Federal trial courts and it seems now well established that upon receipt and acceptance of an interstate shipment by a consignee engaged only in local distribution of the commodities to retail dealers, the interstate transportation has terminated, and any further movement or handling of the shipment is intrastate and labor performed in the unloading of such a shipment by employees of the consignee does not come within the coverage of the Fair Labor Standards Act. Gerdert v. Certified Poultry & Egg Co., 38 Fed. Supp. 964; Prescription House v. Anderson, 42 Fed. Supp. 874; Fleming v. Peoples' Packing Co., 42 Fed. Supp. 868; Duncan v. Montgomery Ward & Co., 42 Fed. Supp. 879; Raunhoff v. Gramling, 42 Fed. Supp. 754.

Affirmed.

HURST, C.J., DAVISON, V.C.J., and RILEY, OSBORN, WELCH, and GIBSON, JJ., concur.