20          APPELLATE COURTS OF ILLINOIS.

VOL. 134.]    Chicago Typo. Union No. 16 v. Barnes & Co.

## Chicago Typographical Union No. 16 et al. v. A. R. Barnes & Company et al.

### Gen. No. 13,061.

STRIKE INJUNCTION—*when proper.* An attempt to coerce parties to sign an agreement constitutes duress, is illegal, and where sought to be accomplished by conspiracy and combination, violence, threats of violence, etc., may be enjoined in equity.

Injunctional proceeding. Appeal from the Superior Court of Cook county; the Hon. JESSE HOLDOM, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1906. Affirmed. Opinion filed May 14, 1907.

Statement by the Court. This is an appeal from a final decree of the Superior Court entered October 24, 1905, perpetually enjoining the principal appellant, which is a labor union, its officers and others alleged to be acting with them as follows:

From in any manner interfering with, hindering, obstructing or stopping the business of said complainants, or any of them, or of their agents, servants or employes, in the operation of the business of said complainants, respectively;

From picketing or maintaining at or near the premises of said complainants, or any of them, any picket or pickets;

From assaulting or intimidating by threats or otherwise the employes of any of said complainants, or any person who may become or seek to become employes of said complainants, or either of them;

From congregating about or near the places of business of any of said complainants or about or near any place where their employes are lodged or boarded, for the purpose of compelling, inducing or soliciting the employes of any of said complainants to leave their service or to refuse to work for them, or any of them, or for the purpose of preventing or attempting to prevent any person from freely entering into the service of any of said complainants;

From interfering with or attempting to hinder complainants, or any of them, in carrying on their business in the usual and ordinary way;

From following the employes of any of said complainants to their homes or other places or calling upon them for the purpose of inducing them to leave the employ of said complainants, or of molesting or intimidating them or their families;

From attempting by bribery, payment or promise of money, offers of transportation or other rewards to induce the employes of any of said complainants to leave their service;

From organizing or maintaining any boycott against said complainants, or any of them;

From attempting to induce customers or other persons to abstain from working for or accepting work from said complainants, or any of them;

From attempting to prevent, by threats or injury, or by threats of calling strikes, any person from accepting work from or doing work for said complainants, or any of them;

From attempting to create or enforce any boycott against any of the employes of the complainants, or any of them, and from attempting to induce people in their neighborhood or elsewhere not to deal with them;

From sending any circular, or other communication to customers, or other persons who might deal or transact business with said complainants, or either of them, for the purpose of dissuading such persons from so doing, and from doing any other act or thing in furtherance of the conspiracy set forth in said bill.

It is claimed in behalf of appellees that appellants had been doing the things enjoined and were threatening to continue to do them "for the purpose of advancing no legitimate trade or business interest of their own, but for the purpose of maliciously inflicting injury upon the business of the complainants."

It is said by appellants' counsel that "in a cause of such moment and importance as this * * * every clause, allegation and sentence (of the bill) should be

22    APPELLATE COURTS OF ILLINOIS.

VOL. 134.]    Chicago Typo. Union No. 16 v. Barnes & Co.

scanned and scrutinized to ascertain what, if any, facts it alleges and what parts of it are to be rejected as allegations of mere conclusions, inferences, colorings and characterizations of the pleader;'' that by this process it will be found that what "upon casual ordinary reading seems to be an allegation of fact is not so in reality," and that "where vital and pivotal facts should and presumably would if they existed have been alleged they are either carelessly or carefully not alleged but only insinuated and left to inference." In reply it is said by appellees' counsel that appellants' "argument evidently proceeds upon the theory that the bill is not to be considered in its entirety, but that each separate clause must contain the elements of a cause of action. It is important, therefore, to get clearly in mind the precise scope of the bill, treating it as a connected whole and giving to it 'the meaning which it fairly conveys to a dispassionate reader by a fairly exact use of English speech.'" In view of these contentions it may be proper to state the material averments of the bill at length as set forth in the abstract. It alleges:

"1. That your orators are, and for some time past have been, members of a voluntary association known as The Chicago Typothetæ, which was organized for the purpose of advancing and improving the printing and binding business in which your orators are severally engaged in the City of Chicago, and also for the purpose of employing skilled mechanics whose services may be required by the members of said association; that each of your orators has been for several years past engaged in the printing business in the City of Chicago and has valuable and well equipped plants, consisting of machinery, tools, supplies, etc., necessary for that purpose, the value of which exceeds, in the case of each one of your orators, many thousand dollars, and that the business of each one of your orators in each year varies from $50,000.00 to upwards of $100,000.00. That in the conduct of said business your

orators have each made many contracts for printing, all of which are necessarily for future delivery, in which, if carried to completion, there will be a substantial profit, but in which, if, for any reason, your orators are unable to fulfill them, a serious loss will be entailed, the exact amount of which cannot now be stated, but will aggregate many thousands of dollars. That, in order to successfully prosecute their business, it is necessary that their several plants run substantially without interruption; that the various departments of each plant are necessarily so connected as to be dependent upon each other so that the operation of each is essential to the completion of the work and the proper conduct of the business. That for the purpose of conducting their business, your orators are compelled to employ many skilled mechanics, among others compositors or typesetters, and that these workmen, by association in the course of their employment, become acquainted with the methods and habits of business in each particular shop so that by reason of that familiarity their services are especially valuable, and changing the workmen and employing those unfamiliar with the work beyond what is required by the ordinary exigencies of business, produces confusion and delay in the completion of work, and in many ways causes substantial injury. For this reason complainants have always sought to obtain workmen of high grade of skill and intelligence and it is important for the successful prosecution of their business that they be allowed to freely exercise their right of obtaining such workmen, irrespective of the question whether such workmen belong or do not belong to a labor union.

"2.  Your orators further show that the defendant, Typographical Union No. 16, is a labor Union organized and existing in the City of Chicago, whose members are typesetters and compositors; that it is one of the rules and a part of the policy of said Union and its members that its members shall not work with mechanics who do not belong to said Union, but are

24     APPELLATE COURTS OF ILLINOIS.

VOL. 134.]     Chicago Typo. Union No. 16 v. Barnes & Co.

what are called non-union men, and that said members shall, at the command and dictation of the union and its officers, strike and leave the employ of an employer who insists upon employing non-union men. A plant or shop in which only union men are employed is, by said Union and in common parlance, called a closed shop, while one in which the employer exercises his right of employing whom he pleases is called an open shop. And it is the rule, principle and policy of said Union and its members to compel employers to abandon their right to maintain an open shop and to submit to the Union's demand that they maintain only a closed shop.

"3. It is also the policy of said Union and its members to adopt certain rules and regulations, both with reference to the length of time which a man shall work at his trade and the amount of wages which he shall receive, and to enforce these rules both by compelling their own members to strike and quit the employment of any one who will not submit to the union rules, and also by certain coercion upon the employer through strikes, interference with his business and workmen and other means so as to compel him to conduct his business in accordance with the rules laid down by the Union. That another means adopted by said Union for the purpose of accomplishing its said purpose is what is called a boycott, by which said Union endeavors, by threats, persuasion and otherwise, to induce and compel people to refuse to do composition and repair work for such an employer, by threatening that any one who does so will have a strike called upon his shop, his men taken out and his business similarly interfered with. That to accomplish this they direct their members in other shops to refuse to do any work brought to such shop from an employer against whom such a strike has been called and, if the work is done, to notify the Union and call a strike against the person so doing it. By which means the Union and its officials and members seek to tie up absolutely the business of any employers with whom they have a dispute so that no

one will deal with him,. and he will be wholly prevented from transacting his business and be so greatly injured that he will, as a means of relief, accede to their demands. That among other methods which are adopted by the Union for the purpose of compelling an employer to submit to the Union's demands and of compelling him to conduct his business in accordance with their wishes, they adopt what is called the picket system, by which there is maintained about the plant of a shop where a strike is in progress a sufficient force of pickets to watch the employes going to and from their work, interfere with them in so doing, endeavor by threats both open and implied, by force and intimidation to prevent them from continuing in their employment, and to induce them to leave their employer for the purpose of inflicting injury upon him by interrupting and interfering with his business. That the Union and its officers and members also, as a means of accomplishing the same result, offer money and other inducements to men thus employed, for the purpose of bribing them to leave their employment, in some cases offering them definite sums of money and in other cases paying their transportation to leave the city and securing or promising to secure for them work in other cities. That they also endeavor to induce the workmen to join the Union so that the Union may thereby acquire power and authority over them and may compel them to obey its demands with reference to strikes and other matters affecting their employment. That all of this is done for the purpose of injuring the employer who is involved in a dispute with his employes or with the Union and of compelling him by such injury to submit to the terms upon which the Union insists. And your orators charge that all of the acts of the defendants hereinafter set forth and of those conspiring with them to accomplish their ends were in furtherance of this plan and for the purpose of inflicting injury upon your orators.

"4. Your orators further show that said Typographical Union No. 16, in the early summer of 1905,

26    APPELLATE COURTS OF ILLINOIS.

VOL. 134.]    Chicago Typo. Union No. 16 v. Barnes & Co.

announced that after January 1, 1906, it would in-
sist that eight hours should constitute a day's work
for compositors in the City of Chicago, and that no
workman should be allowed to work more than that
time nor any employer allowed to employ workmen
who worked more than eight hours. That your ora-
tors and the said Association known as The Chicago
Typothetæ have, on the other hand, insisted upon their
right to determine for themselves upon what terms
they would contract with their workmen, and upon
their right to be left free to contract with workmen
upon such terms as would be mutually satisfactory to
both parties. For this reason the complainants and
said The Chicago Typothetæ have incurred the hos-
tility of said Union and its members, and they have
in various ways, as is more particularly hereinafter
set forth, combined together to injure said Typothetæ
and its members and to prevent them from carrying on
its business except in a manner satisfactory to the
Union.

"5. Your orators further show that on or about
the 5th day of July, 1905, certain of your orators, to-
wit: The Faithorn Printing Co., and in August, 1905,
R. R. Donnelly & Sons Co., A. R. Barnes & Co., Clinic
Publishing Co., employed non-union compositors in
their respective offices, and thereupon said Typograph-
ical Union No. 16 directed the members of that Union
who were working for said complainants to strike
and leave their employment because of the presence
of said non-union workmen in the shop. That shortly
thereafter the officials of said Union called upon other
members of your orators and demanded that they agree
with said Union and its members that on and after
January 1, 1906, they would submit to the demand of
the Union for an eight-hour day and would also agree
to maintain a closed shop. The complainants so ap-
plied to by the Union refused to accede to this demand
or to make such agreement, and thereupon the officials
of said Union directed all of the union men belonging
to said Union in said shops to strike and to quit work,

and said workmen, in obedience to the command of said Union, immediately left the employment of your complainants, and since that time have refused to work for them. That immediately upon the calling of said strike said Union and its said officers and other defendants inaugurated and have since maintained a system of picketing the places of business of said complainants, the pickets being in some instances the workmen who had left the employment of the complainants, and in some cases were other persons hired by the Union for that purpose, or by members of the Union, or who were ordered there by the Union for that purpose. That these pickets have surrounded the respective places of business of the complainants, have maintained a constant watch upon its employes going to and from its business and in many cases intimidated them and endeavored, by threats and in some cases by assaults and open violence, to compel them to leave the employment of the complainants. That in other cases they have endeavored to induce or to compel the employes to leave the service of the complainants by bribes and offers of money, by offering to procure for them work in other places, or by offering and giving them transportation to leave the city, and by these and similar means have induced, and are now constantly trying to induce them to leave the employment of the complainants. That the money necessary for this purpose is furnished by said Union, and that the pickets who thus watch are maintained by and are under the control and direction of the Union and its said officers and the committees appointed by it, for the purpose of continuing said strike. And your orators charge that these and the other methods of interfering with their business herein set forth have been for several weeks continuously carried on by said Union and its officers and members. And your orators present herewith the affidavits of numerous named individuals, and make the same a part of this bill, and offer the same as evidence, showing for greater certainty the details of many acts of such interference by said defendants.

28    APPELLATE COURTS OF ILLINOIS.

VOL. 134.]    Chicago Typo. Union No. 16 v. Barnes & Co.

"6. Your orators further allege that by this means said Union and its officers and the other defendants have seriously interfered with the business of each of your orators; that they have taken away from them, by the means above referred to, many of their employes, and have prevented them from obtaining other employes who are willing to work in the places of those who had thus voluntarily left their work. That your orators have on hand many contracts and a large amount of unfinished work which they can complete through the service of men who are willing to work upon terms mutually satisfactory to them and to said complainants, if said defendants are prevented from further carrying out their said plans and are prevented by the injunction of this court from further interference with the business of your orators and with their efforts to carry on said business.

"7. Your orators further show that the said defendants are acting together in pursuance of a common plan to injure your orators and to interfere with their business and to prevent them from carrying on their business as aforesaid, and that they are acting against all of your orators, both jointly and severally, for the purpose of injuring each and all of them and of compelling each and all of them to agree to the terms imposed by said Union and to the condition upon which they are willing to allow their members and other compositors to work as above stated.

"8. Your orators further show and allege that they have no adequate remedy at law for the protection of their interests; that said Union is a voluntary organization and that its members are financially irresponsible so that no adequate judgment for damages against them or any of them could be collected; that the injury to the business of your orators is, and is intended to be, continuous in its effect and to be carried to such an extent as practically to destroy their business, the value of their plants and the capital invested therein, and that your orators are wholly without remedy except by an injunction issued by this court.

"9.   Your orators further show that there have been many strikes called, organized and maintained by labor unions in the City of Chicago during the past three years in which similar picket systems have been maintained and in which the unions calling the strikes and others sympathizing with and aiding them have maintained similar picket systems and by said picket systems and otherwise have, by force, intimidation, violence, persuasion and otherwise, interfered with the employers against whom said strikes have been maintained, who in common parlance are called 'struck houses,' and have interfered with their employes so that it has become a matter of common knowledge and belief among non-union men and those who are willing to work where strikes are in progress that it is unsafe for them to work for a struck house or to incur the enmity of a union by taking the place of a striker or assisting in any way an employer having a strike to carry on his business, and thereby many men have been intimidated, and all such workmen have just cause for alarm whenever a picket system is maintained, and for believing that injury will result to them in some form if they work or in any way give assistance to a struck house.   That this feeling is general and that added force is given to the mere presence of a picket line and to the efforts of the Union and its members in endeavoring to dissuade non-union men from working for such an employer.   That this feeling applies to the situation presented by your orators' case, and by means whereof the efforts of said pickets and of the defendant Union and its members are made effective.

"10.   Your orators further show that the defendant Union, in its endeavor to enforce its demand for an eight-hour day and the closed shop, as above stated, presented to the different printing houses in Chicago and compelled or induced many of them to sign agreements to that end, and that it is the purpose of said Typographical Union in calling and maintaining said strikes against your orators and in doing against them the acts herein complained of, to coerce them into mak-

30      APPELLATE COURTS OF ILLINOIS.

VOL. 134.]      Chicago Typo. Union No. 16 v. Barnes & Co.

ing similar agreements with said Union. A copy of which agreement as printed and prepared by the Union is hereto attached, and is as follows:

'EDWIN R. WRIGHT,
President.

[Chicago Typographical
Union, Organized June
1852.]

THOMAS P. McCOOEY,
Vice-President.

'CHICAGO TYPOGRAPHICAL UNION No. 16,

Room 227 Garden City Block, 56 Fifth Avenue.

JOHN C. HARDING,
Organizer.

P. O. Box 420.

WILLIAM McEVOY,
Secy.-Treas.
Telephone Main 3995.

CHICAGO, ILL. Sept. 14, 1905.

'On behalf of and with authority for the firm of.... ........................................... the undersigned hereby agrees to employ none but members of the Chicago Typographical Union, No. 16, in any department of the composing room, or upon any composition, either by hand or machine; or upon any work such as reading proof, making up forms, care of printing material, or upon any other work pertaining to the composing room; and agrees to provide sanitary and healthful workrooms; and further agrees to respect and observe the conditions imposed by the Constitution, By-Laws and Scale of Prices of Chicago Typographical Union No. 16, of current date.

'Beginning January 1, 1906, the eight-hour day shall go into effect.

'No work shall be done for struck shops having difficulty with Typographical Union No. 16.

'Chicago Typographical Union No. 16 agrees to furnish competent union workmen on demand.

'This agreement to continue for one year and end October 1, 1906.

....................                For the Firm of

   President              ....................

....................            ....................

   Secretary

Chicago Typographical Union No. 16.'

"That in the furtherance of their said design and to create and maintain a boycott against all printing shops who would not sign said contract and agree to their terms, said Union issued circulars directed to the representatives of the Union working in different shops in the City of Chicago and elsewhere (which representatives are called chapel foremen), as follows:

'Telephone 3995 Main.

'[Chicago Typographical
 Union, Organized June,
 1852.]

'Office of
CHICAGO TYPOGRAPHICAL UNION No. 16.
Garden City Block, 56 Fifth Ave.,
Room 227.

'CHICAGO, ILL., August 31, 1905.

To CHAIRMEN OF UNION CHAPELS UNDER THE JURISDICTION OF C. T. U. No. 16:

'GENTLEMEN: As you are doubtlessly aware, we have strikes on at the following offices (naming 19 offices, mostly of complainants).

'You are instructed to report immediately any work coming to your office from any of these firms. The Executive Committee has ordered that all work stop on work for strike-bound houses. If chairmen will report such work immediately, an officer of the Union will call and endeavor to adjust such difference.

'Work done in its entirety (composition, presswork, etc.), or balance of work in union house, and a contract entered into to that effect for a period of time, will be considered satisfactory.

32    APPELLATE COURTS OF ILLINOIS.

VOL. 134.]    Chicago Typo. Union No. 16 v. Barnes & Co.

'By order of the Executive Committee, Chicago Typographical Union No. 16.

EDWIN R. WRIGHT,
President.

JOHN C. HARDING,
Organizer.'

"11.   Your orators further show that the defendants, Fred C. Klein, Hack & Anderson and Sleepeck-Helman Printing Co., who are engaged in the printing business, have been induced by said Union and its officers to sign contracts with said Union similar to that above set forth; that but for that fact they would be willing to do work for your orators, but by reason of their having signed said contracts, they will be induced to refuse to do so by fear that said Union will call a strike against them and enforce a similar boycott— which your orators believe and charge said Union will do.   And your orators further charge that said agreements are illegal and void, and ought not to be observed by the parties so making the same, and that said contracts are a part of the conspiracy against your orators, and said Union should not be allowed to enforce them by calling strikes against said Fred C. Klein Co., Hack & Anderson or Sleepeck-Helman Printing Co., and thereby injuring your orators by compelling said parties to refuse to do work for them. That by means of these circulars and similar attempts said defendant Union, its officers and members, have organized, and are now attempting to enforce, a boycott against the complainants and seek to prevent them from having work done by other printing houses or by shops to whom they might apply for work so as to prevent the complainants from carrying on their business except upon condition that they make an agreement similar to that demanded by the Union.   In furtherance of this plan and conspiracy said Union publishes weekly what is called a 'directory of union printing offices of Chicago,' containing the names of offices who have been willing to submit to the Union's terms, and

containing also a list of 'offices on strike,' in which latter list are published the names of the complainants; and that this directory is widely circulated, for the purpose of showing to all persons the names of the printing offices with whom they can deal with safety, because they have not incurred the ban of union labor, and for the purpose of showing also the names of those who, merely because their men are on strike, are boycotted by the Union, and those whom it can induce to assist it in its said efforts. That said Union and those co-operating with it, as a part of said plan, are also attempting and will continue to attempt to create a boycott against your orators' employes to induce people in their neighborhood and elsewhere not to deal with them, for the purpose of thereby compelling said employes to leave your orators' service.

"12: Your orators further allege that among those who, as pickets and otherwise, are assisting said Union and its officers in their said plans and acts against your orators, are the co-defendants, Edward E. Bessette (naming numerous other persons), and that said Bessette is, as your orators are informed and believe, in charge of said pickets and of their operations.

"13. Your orators further show that by those and other means, all of which are directed toward the common end by the defendants and by others assisting them and by said Union in their aforesaid plan, said Union, its officers and the other defendants seek to injure said complainants and to destroy their business as far as possible, for the purpose, through the injury thus created, of compelling them to agree to the Union's terms and of striving to seduce their employes so as to prevent them from carrying on their business. That said defendants will continue their said efforts unless restrained by the injunction of this court, and that without such injunction the complainants will be without remedy."

Attached to the bill as exhibits are forty-seven affidavits, the allegations of which are made part of the

34    APPELLATE COURTS OF ILLINOIS.

VOL. 134.]    Chicago Typo. Union No. 16 v. Barnes & Co.

bill by express reference thereto. These tend to show that a picket system is maintained about complainants' places of business, that these pickets are endeavoring by offers of money and other means to induce complainants' employes to leave their employment and to leave the city for the purpose of crippling complainants' business, not in legitimate trade competition but maliciously and to inflict wilful injury upon complainants, that these pickets have constantly threatened complainants' employes with physical injury if they continued to work for complainants and have in a number of cases actually assaulted such employes, and that such pickets have almost invariably stated to such employes that their purpose was to break up complainants' business and compel complainants to submit to the demands of the Union, the object being to compel complainants to adopt the eight-hour day and the policy of the closed shop.

A motion to dissolve or modify the injunction was overruled, and thereupon a joint and several demurrer of all defendants to the bill of complaint was filed, assigning as grounds of demurrer:

1st. The granting of the relief prayed for would and will deprive defendants and each of them of liberty and property without due process of law, in violation of article II, sec. 2 of the Constitution of Illinois.

2nd. Would and will deprive defendants and each of them of the right secured to them and each of them by article II, sec. 4 of the Constitution of Illinois, which provides that "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty."

3rd. Would and will deprive defendants and each of them of the right to assemble in a peaceable manner to consult for the common good, contrary to article II, sec. 17 of the Constitution of Illinois.

4th. Would and will contravene the rights guaranteed to defendants and each of them by article V of Amendments to the Constitution of the United States,

by depriving them and each of them of liberty and property without due process of law.

5th. Would and will deny to these defendants and each of them the equal protection of the laws and abridge the privileges and immunities of these defendants and each of them as citizens of the United States, in violation of article XIV, sec. 1 of the amendments to the Constitution of the United States.

6th. And would and will reduce these defendants and each of them to a condition of involuntary servitude, in violation of article XIII of sec. 1 of the Constitution of the United States.

The demurrer was overruled and defendants elected to stand by said demurrer.

A final decree for permanent injunction was thereupon entered against all of the defendants, enjoining and restraining them, their agents and servants, etc., as prayed in the bill of complaint, and as enjoined by the order for preliminary injunction.

The defendants and each of them prayed an appeal which was allowed to any or either of them, and it was ordered that the perfecting of such appeal should not stay the operation of the injunction, to which further order defendants excepted.

WILLIAM H. BARNUM, for appellants.

TENNEY, COFFEEN, HARDING & WILKERSON, for appellees; HORACE KENT TENNEY and JAMES H. WILKERSON, of counsel.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

It is first insisted in appellants' behalf that if the final injunction is not reversed as a whole it should be so modified as not to restrain appellants from the exercise of what are claimed to be lawful and constitutional rights; that appellants are, by the injunction, restrained from in any manner interfering with the business of complainants, whether such interference

36 APPELLATE COURTS OF ILLINOIS.

Vol. 134.]  Chicago Typo. Union No. 16 v. Barnes & Co.

be lawful or unlawful, peaceful or forcible, malicious or otherwise, even though such interferences be merely that of ordinary competition. We do not so understand the scope of the bill or of the injunction. The former, including the affidavits made a part thereof, describes a combination to injure the complainants by unlawful means. It charges that it was the purpose of the appellant' Union by the acts complained of to coerce appellees into making and signing certain agreements, which it is alleged the Union has compelled other printing houses in Chicago to sign through fear of the force, intimidation, violence and kind of persuasion which it is alleged have characterized many strikes called and maintained by labor unions in Chicago during the previous three years. An attempt to coerce appellees to sign an agreement by threats is unlawful. O'Brien v. The People, 216 Ill. 354-373. The agreements as set forth if acquiesced in would compel appellees, among other things, to employ none but members of the appellant Union, to obey the Union's rules as to wages, to allow employes to work only eight hours a day, to do no work "for struck houses having difficulty with Typographical Union No. 16," etc. What ever might be the effect of such an agreement upon appellees' business, it is at least apparent that under it they would surrender its control in important respects. To what extent such surrender would be injurious might depend upon the way in which the Union chose to exercise the power the agreement would confer. Appellees would surrender such control, according to the averments of the bill, to an irresponsible body of men accountable to no one for the way in which they exercise the power they seek to acquire by such agreement. However this may be, no one disputes, so far as we are advised, that appellees have a right to determine for themselves whether it is for the interest of their business to bind it by such an agreement. The scope of the injunction is that it restrains appellants from unlawful interference with appellees' business in pursuance of an alleged conspiracy to compel the

latter to submit to the Union's demands and become a party to such agreement willingly or unwillingly. It does not purport, as appellants' counsel claim it does, to restrain appellants from entering into legitimate business competition with appellees. There is no pretense in the pleadings or argument in appellants' behalf that the latter have or ever had any plan for such competition which they were endeavoring to put into execution.

We cannot within the limits appropriate undertake to follow appellants' counsel in his analysis of the language of the separate clauses of the bill, and it would serve no useful purpose so to do. The scope and compass of the bill cannot, we think, in this instance be measured in that way. It has been said by the U. S. Supreme Court (Swift v. United States, 196 U. S. 375-395): "A bill in equity is not to be read and construed as an indictment would have been read and construed a hundred years ago, but it is to be taken to mean what it fairly conveys to a dispassionate reader by a fairly exact use of English speech. Thus read this bill seems to us intended to allege successive elements of a single connected scheme." We are of opinion that the bill before us sets forth with sufficient clearness, fulness and accuracy, facts which tend to show the existence of a combination on the part of appellants to injure appellees' business and make it impossible or at least difficult to carry it on, and that the purpose of the combination was, and its acts pursuant to such purpose were, designed to compel appellees to allow appellants to dictate terms upon which appellees' business might be peacefully conducted. The demurrer admitted the allegations of the bill and also the averments of the affidavits which are by reference expressly embodied as a part of it, and so far as they are well pleaded the facts must be assumed to be correctly stated. There are many things not in themselves unlawful, privileges which all alike may exercise lawfully, but which if done or exercised in pursuance of an unlawful and malicious intent and purpose, it is no infringement of

the rights of a citizen to restrain. O'Brien v. The People, 216 Ill. 354-365-6; Doremus v. Hennessy, 176 Ill. 608-615. The injunction in this case cannot, however, be fairly construed to restrain appellants from the exercise of a right to ''strike,'' nor from announcing in advance that they intend to strike, as their counsel seems to suppose it does. The injunction restrains appellants ''from attempting to prevent by threats of injury or by threats of calling strikes, any person from'' doing work for complainants. Such threats to coerce are expressly held to be unlawful in O'Brien v. The People, 216 Ill. 354, on page 373. It is one thing to declare a purpose to strike and quite another thing to use threats of any kind to intimidate others, and in order to injure them or third parties. The language referred to, taken in connection with the general purpose of the injunction as shown by a fair interpretation of its meaning, is not open to the objection urged.

Nor does the injunction seek to interfere, so far as we discover, with the right of the Union to endeavor to maintain in a lawful way its desire for a closed shop or an eight-hour day, nor with the right to strike or to refuse to work for whomsoever its members may choose or for less than a certain scale of wages, nor with the right to exercise any legitimate privilege enjoyed by virtue of the law of the land. All rights, whether called natural or legal, are exercised in a community governed by law subject to the restriction that they must not be so exercised as to interfere with the equal rights of others. It is stated by appellants' counsel ''that if the employer wishes to avail himself of union labor which he is under no compulsion to employ, he must take it if at all on terms such as union labor has the right on its side to insist upon,'' and that ''the claim that employers have the right to conduct their business as they please is no more potential than the claim of union workmen that they have the right to conduct their business (which is their labor) on such terms as they please.'' So far as we are aware this is not and never has been con-

troverted.  But it appears from the bill in this case, the allegations of which, as we have said, are admitted by the demurrer, that appellants are and have been endeavoring to place appellees under "compulsion to employ" union labor and solely on its own terms, and that to this end they were using force, intimidation and violence.

It is said in behalf of appellants that Christensen v. Kellogg Switchboard & Supply Co., 110 Ill. App. 61; O'Brien v. The People, 216 Ill. 354; Franklin Union v. The People, 220 Ill. 355, are not controlling in this case because it is said the facts alleged in the present bill fall far short of those alleged in the bills in those cases.  If by this is meant that the bill in the case at bar does not entitle appellees to the relief sought by injunction we cannot concur.  The bill in this case does not differ materially in its nature from the bills in those cases.  In all these cases the conditions described are substantially the same, differing only in detail and not in the causes which produce them nor in the methods employed or results which follow.  In all alike appear the same purpose to coerce, the lawless and criminal methods used to effect the purpose, the interference with private right and with the public peace and order, such as are described in the bill before us, differing only in degree.  In Doremus v. Hennessy, 176 Ill. 608-614, it is said: "It is clear that it is unlawful and actionable for one man from unlawful motives to interfere with another's trade by fraud or misrepresentation or by molesting his customers or those who would be his customers, or by preventing others from working for him or causing them to leave his employ by fraud or misrepresentation or physical or moral intimidation or persuasion with an intent to inflict an injury which causes loss. * * * Every man has a right under the law as between himself and others to full freedom in disposing of his own labor or capital according to his own will, and anyone who invades that right without lawful cause or justification commits a legal wrong." In Purington

v. Hinchliff, 219 Ill. 159-166, it is said: "No person or combination of persons can legally, by direct or indirect means, obstruct or interfere with another in the conduct of his lawful business. * * * All parties to a conspiracy to ruin the business of another because of his refusal to do some act against his will or judgment are liable for all overt acts illegally done pursuant to such conspiracy and for the subsequent loss, whether they were active participants or not." That the facts alleged in the present bill do not fall short of those in the cases referred to, unless in degree, is apparent from the language used in O'Brien v. The People, *supra,* p. 373. "There can be no doubt that any attempt to coerce the Kellogg Switchboard and Supply Company into signing said agreement by threats to order a strike was unlawful. It was violative of the clear legal right of the company and was unjust and oppressive as to those who did not belong to labor organizations." In Franklin Union v. The People, *supra,* p. 378, the same citation is quoted with approval.

We need not follow counsel in the discussion of the effect of a malicious purpose in making unlawful acts which under other circumstances might be lawful, nor cite additional authorities upon that point or to show that the conspiracy charged in the bill was unlawful at common law as well as under the criminal code of this State. That the purpose of appellants and the means adopted to carry it into effect—picketing, such as the bill describes, intimidation, threats, assaults, interference with employes, the boycott so-called—are unlawful and properly subject to restraint by injunction must be deemed settled under the law of this State as announced in cases we have cited. To go over again the same ground covered by the opinions in those cases would serve no useful purpose.

The injunction complained of applies the law correctly to the facts stated in the bill, and we find no error in the decree making it permanent. The decree will therefore be affirmed.

*Affirmed.*