FEDERAL TRADE COMMISSION et al. v. CLAIRE FURNACE CO. et al.

(Court of Appeals of District of Columbia. Submitted May 22, 1922. Decided January 2, 1923.)

No. 3798.

1. Equity ⊙═262—Pleading ⊙═8(13)—Statements as to powers of Congress and Trade Commission are conclusions not admitted by motion to strike.

Extensive arguments in the answer relative to the powers delegated by Congress to the Trade Commission and the power of Congress under the commerce clause of the Constitution (article 1, § 8), are mere legal conclusions, not admitted by the motion to strike the answer.

2. Trade-marks and trade-names and unfair competition ⊙═80½, New, vol. 8A Key-No. Series—Powers of Trade Commission are limited to matters directly relevant to interstate commerce.

The powers of the Trade Commission are limited to matters directly relevant to interstate commerce, so that the corporation under investigation must not only be engaged in such commerce; but the subject under investigation must be so related to interstate commerce that its regulation may be accomplished by an act of Congress, or so interwoven with interstate commerce that the whole subject is necessarily brought within the jurisdiction of Congress.

3. Commerce ⊙═3—Interstate business of corporations held separable from intrastate, and not subject to federal regulation.

Where corporations maintained manufacturing plants in a single state, but purchased their raw materials or produced them at points without the state, and had them shipped by interstate carriers to their plants, and then sold the manufactured product in interstate commerce, the intrastate portion of the business was separable from the interstate so as not to be subject to regulation by Congress.

4. Commerce ⊙═16—Manufacture or production is not "commerce."

The manufacture or production of goods is not "commerce."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Commerce.]

5. Commerce ⊙═16—Manufacture and production may be accessory to interstate commerce.

Where manufacture and production are a part of, and essential to, the operation of an instrumentality of interstate commerce, they may be so intimately associated with the instrumentality itself as to be an accessory thereto, whose regulation is necessary to insure regulation of the instrumentality.

───────────────────
⊙═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. Commerce ⚏16—Purchase or production of raw material shipped interstate is not "interstate commerce."

The purchase or production by a manufacturer in another state of the raw materials for his plant, which are then delivered to an interstate carrier for shipment to the plant, are not in themselves commerce, since the articles are not used in connection with an instrumentality of commerce.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

7. Commerce ⚏16—Congress cannot regulate manufacture of raw material shipped interstate into a product for interstate shipment.

Except where the act of production or manufacture is directly related to the operation of an instrumentality of commerce, Congress cannot regulate the manufacture of raw materials which have been shipped to the factory in interstate commerce into products which are to be shipped in interstate commerce.

8. Commerce ⚏1—Congress cannot indirectly regulate what it cannot directly regulate.

If Congress may not regulate manufacture and production directly, because it is not a part of interstate commerce, it may not regulate it indirectly, through the medium of publicity.

9. Trade-marks and trade-names and unfair competition ⚏80½, New, vol. 8A Key-No. Series—Steel and iron business is not affected with public interest.

The steel and iron business of the country is not affected with a public interest, such as to justify its regulation for the promotion of the public welfare.

10. Trade-marks and trade-names and unfair competition ⚏80½, New, vol. 8A Key-No. Series—Trade Commission has no general visitatorial powers.

The Federal Trade Commission is not invested by Federal Trade Commission Act, § 6 (Comp. St. § 8836f), empowering it to gather and compile information concerning corporations engaged in commerce, etc., with authority to inquire into any business of nation-wide extent, and has no visitatorial powers coextensive with the constitutional functions of Congress; but its activities are strictly limited to the field of interstate commerce, outside of the portions of that field occupied by the act to regulate commerce and the Federal Reserve Act.

Smyth, Chief Justice, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Suit by the Claire Furnace Company and others against the Federal Trade Commission and its members. Decree for complainants, and defendants appeal. Affirmed.

J. Wallace Nichol, W. H. Fuller, and William T. Chantland, all of Washington, D. C., for appellants.

Levi Cooke and George R. Beneman, both of Washington, D. C., A. Leo Weil, of Pittsburgh, Pa., and William Wallace, Jr., of New York City, for appellees.

Before SMYTH, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. Appellee corporations filed a bill in the Supreme Court of the District of Columbia for an injunction to restrain appellant Federal Trade Commission from enforcing or attempting to enforce an order issued by the Commission against the

complainant companies, requiring them to furnish monthly reports of the cost of production, balance sheets, and other information in detail, upon a large variety of subjects relative to the business in which complainant corporations are engaged.

The authority under which the Commission assumes to act is expressed in a resolution, wherein it is stated that, at a hearing held by a committee of the House of Representatives, the Commission was requested to suggest what might be done to reduce the high cost of living. In response the Commission recommended to the committee:

"That it would be desirable to obtain and publish from time to time, current information with respect to the 'production, ownership, manufacture, storage and distribution of foodstuffs, or other necessaries, and the products or by-products arising from or in connection with the preparation and manufacture thereof, together with figures of cost and wholesale and retail prices,' and particularly with respect to various basic industries, including coal and steel."

An appropriation of $150,000 was made available, and the Commission resolved to—

"proceed to the collection and publication of such information with respect to such basic industries as the said appropriation and other funds at its command will permit, and that such action be started as soon as possible with respect to the coal industry and the steel industry, including in the latter closely related industries, such as iron ore, coke, and pig-iron industries."

The alleged purpose of this report was to compile in combined or consolidated form the data received from individual companies, and to issue currently in such form accurate and comprehensive information regarding changes in the conditions of the industry, both for the benefit of the industry and of the public. At the same time, orders were issued to the complainant coal and coke companies requiring them to report the—

"monthly costs of production for the several products designated and other data as specified, in the form prescribed."

Accordingly the Commission issued to each of the complainant companies forms of reports, schedules, and questionnaires, calling for detailed information regarding the amount of products produced by the several complainants respectively, the sales and contract prices thereof, and orders booked by them, the amounts allocated by them to depreciation, and administrative and selling expenses, and also to file with the Commission quarterly income statements and balance sheets. In addition the Commission required complainants to submit their accounts and books for inspection, to enable it to check the reports which complainants were required to furnish from time to time. Complainants were warned that upon failure to comply with the orders of the Commission the penalties prescribed by section 10 of the Trade Commission Act (Comp. St. § 8836j) would be imposed upon them.

Complainants allege, and it is not denied in the answer, that they—

"are engaged in producing, manufacturing, and making sales, in the states wherein their producing and manufacturing operations are conducted, and all of them are conducting mining operations, or manufacturing plants, or both."

The location of the manufacturing and mining plants is given and it appears that the companies are engaged in producing pig iron, tin plate, strip steel, billets, slabs, ingots, blooms, and other products of iron and steel, finished and unfinished. It further appears that some of the companies are engaged in coal mining, manufacturing coke, and mining of ore. Defendant Commission avers in its answer that with the exception of three companies named—

"sixty-five per cent. or more of the sales made by each of complainants is in interstate or foreign commerce, and that the greater portion of the principal raw materials of each concern is purchased and transported in interstate commerce to their converting plants."

The right of the Commission to make the inquiry here involved is based upon the power of Congress to secure information concerning any subject-matter in regard to which it has been given the power to legislate, and upon the further proposition that, when one phase of a subject-matter is within the jurisdiction of Congress, it possesses the power to secure information as to the whole of the subject-matter as a guide to further legislation. It is also urged that power to obtain information is not limited to interstate commerce, but includes intrastate commerce as well, when the two phases are a part of one subject; that the orders and report forms issued to complainants and others are for the purpose of inquiring into the whole of the steel industry of the United States, which industry, it is averred, includes both interstate and intrastate commerce. The Commission then seeks to justify its proposed inquiry into complainants' business, both interstate and intrastate, upon the hypothesis that the publication and dissemination of the information obtained will benefit the public and furnish a guide for future legislation.

Complainants having failed and refused to make the reports, the Commission by written notice threatened the imposition of penalties for delay or failure to make due report as required. It is to restrain the Commission from carrying the threats into effect that the present injunction is sought.

The Commission answered the bill, and complainants moved to strike out certain parts of the amended answer, and to strike the entire amended answer from the files. The court ordered:

"First. That the motion to strike out certain parts of the amended answer be overruled without prejudice to the right of the plaintiffs on any further hearings in said suit to raise objections to matters not properly pleaded.

"Second. That the second motion to strike the entire amended answer from the files be and the same is hereby denied, except as to the ground that the said amended answer set forth no defense to the bill of complaint."

Defendants refusing to further plead or amend their answer, and expressing their willingness to stand upon their answer as a sufficient and complete defense, the court, treating the motion to strike as in the nature of a demurrer, entered a judgment making the temporary injunction final, from which decree this appeal was taken.

[1] The extensive arguments set out in the answer, relative to the powers delegated by Congress to the Commission, the power of Congress under the commerce clause of the Constitution, the authority of

the Commission to investigate the business affairs of a shipper in interstate commerce, the delegated power to inquire into the production of any commodity in nation-wide use, and the constitutional power of the Commission to compel disclosure of the business methods employed by manufacturers and producers, are mere legal conclusions, not admitted by the motion to strike.

The statutory authority under which the Commission in this instance presumes to act is found in section 6 of the Federal Trade Commission Act (38 Stat. 717 [Comp. St. § 8836f]), which provides:

"That the Commission shall also have power—

"(a) To gather and compile information concerning, and to investigate from time to time the organization, business conduct, practices and management of any corporation engaged in commerce, excepting banks and common carriers subject to the act to regulate commerce, and its relation to other corporations and to individuals, associations, and partnerships.

"(b) To require, by general or special orders, corporations engaged in commerce, excepting banks, and common carriers subject to the act to regulate commerce, or any class of them, or any of them, respectively, to file with the Commission in such form as the Commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the Commission may prescribe, and shall be filed with the Commission within such reasonable period as the Commission may prescribe, unless additional time be granted in any case by the Commission."

The act further authorizes the Commission—

"to make public from time to time such portions of the information obtained by it hereunder, except trade secrets and names of customers, as it shall deem expedient in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use."

The word "commerce," as used in the act, is defined as:

"Commerce among the several states or with foreign nations, or in any territory of the United States or in the District of Columbia, or between any such territory and another, or between any such territory and any state or foreign nation, or between the District of Columbia and any state or territory or foreign nation."

It will be observed that the inquiry instituted by the Commission originated from a discussion of a committee of Congress relative to the high cost of living, and an appropriation by Congress of a lump sum to enable the Commission to conduct such investigations as it might deem proper. There was no specific direction by Congress to make an investigation of the steel, iron or coal business. The Commission on its own motion and by resolution instituted this investigation.

The Commission is not proceeding upon any complaint filed before it, charging complainants with unfair competition, or the violation of the Federal Trade Commission Act (Comp. St. §§ 8836a–8836k), or the Anti-Trust Acts. Neither is it the expressed intention of the Com-

mission to make an investigation relative to the operations of complainant companies in interstate commerce. The investigation seems to be more in the nature of a news-gathering expedition, in hope of securing something of public interest for publication, or possibly subject-matter or future legislation by Congress. Common justice would seem to demand that before the business methods pursued by a corporation or an individual should be investigated, the party should be apprised either by a formal charge or by notice of the extent of the purposed investigation, in order that a day in court may be accorded. This is essential to determine whether the Commission is acting within its jurisdiction and to meet the charges preferred.

[2] This brings us to the point of determining whether in the present investigation the Commission was acting within its jurisdiction. The authority of the Commission, we think, is limited by the acts of Congress to investigating and reporting upon unfair methods of competition in interstate commerce, the enforcement of anti-trust decrees and violations of the anti-trust laws, and the making and publishing of reports thereon. The powers of the Commission are limited to matters directly relevant to interstate commerce. In other words, the corporation under investigation must not only be engaged in interstate commerce, but the subject under investigation must be so related to interstate commerce that its regulation may be accomplished by act of Congress. Where the operations of a corporation, engaged in both interstate and intrastate commerce, are so interwoven and intermingled as to be inseparable, it may be conceded that in order to regulate interstate commerce, the intrastate phases may be subjected to regulation and possible restriction, since the whole subject is thus brought within the jurisdiction of Congress.

[3] But that is not this case. Here there is no intermingling in such manner as to render the interstate and intrastate features inseparable. Indeed, it is said of the iron and steel companies, in the brief of counsel for the Commission, that:

"Appellees bring their raw material from other states into those states where their plants are situated, and when the conversion or fabrication is complete approximately 65 per cent. of the total of such converted products is sold and shipped into other states."

Three separate and distinct operations are involved: First, the shipment of raw materials to the plants. If from outside of the state, the materials are in the nature of freight in interstate commerce from the time they are delivered to the carrier until they are delivered by the carrier at the plant. Second, the processes of manufacture by which the raw materials are converted into finished products, during which time the complainants are not engaged in commerce. Third, the sale and delivery of the finished product. If this is made outside of the state where the product has been manufactured, the product is in commerce as freight from the time of delivery to the carrier at the plant, until the carrier in turn delivers it to the consignee at destination. Indeed, the answer tacitly concedes the three operations by complainants —the assembling, the manufacture, and the sale of the manufactured article.

It therefore does not appear that complainants are common carriers or engaged in the operation of any of the instrumentalities of commerce. They are mere shippers, and as such are engaged in commerce only from the time their products, whether it be raw material or the finished product, are delivered to the carrier and in turn by the carrier delivered to them or to their consignees.

"When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state." In re Greene, 52 Fed. 113, quoted with approval in Hammer v. Dagenhart, 247 U. S. 251, 272, 38 Sup. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724.

[4] Nothing is more clearly established by a long line of decisions than that manufacture is not commerce. In Kidd v. Pearson, 128 U. S. 1, 20, 9 Sup. Ct. 610 (32 L. Ed. 346), the court said:

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than' that between manufactures and commerce. Manufacture is transformation—the fashioning of raw°materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation."

It is equally well established that the mere act of production is not commerce. As the court said in Hammer v. Dagenhart, supra:

"However much the Knight Case, 156 U. S. 1, may be weakened by later decisions, its distinction between production and commerce is still effective to prevent direct congressional regulation of production as distinguished from sale and transportation."

[5] Where manufacture and production are a part of and essential to the operation of an instrumentality of interstate commerce, they may become so intimately associated with the instrumentality itself that they may be treated as accessory thereto. In such a case inquiry into the conditions of manufacture and production may become necessary to insure intelligent regulation of the instrumentality. A coal mine or railroad shop maintained by the same company, or by a subsidiary company to further the operation of a railroad or other instrumentality of interstate commerce, may be so closely associated with the operation of the road itself that their operation may be conducted in such a manner as to obstruct or burden the freedom of interstate commerce, and, therefore, be within the regulatory power of Congress. But this condition has no application where the manufacture and production are independent of the operation of an instrumentality of commerce.

[6] In the present case some of the complainants, either directly or through subsidiary companies, produce the coal, ore, and coke used in manufacturing their iron and steel products, while other complainants purchase these materials for similar use. In these circumstances, the mere production or purchase is not commerce, since the articles are not used in connection with an instrumentality of commerce, but are delivered to common carriers for transportation, thus creating the relation merely of shipper and carrier. The mining of the coal and ore,

and the production of the coke, precede and are independent of any act of commerce, just as manufacture is independent of commerce.

[7, 8] Except where the act of production or manufacture is directly related to the operation of an instrumentality of commerce and directly connected therewith, the regulatory power of Congress over the commerce in shipping raw materials to the manufacturing plant and the commerce in shipping the product from the plant terminates with the assembling and begins again with the shipment of the manufactured product. It also follows that, if Congress may not regulate manufacture and production directly, it may not regulate it indirectly through the medium of publicity. No facts are alleged from which it may be inferred that the interstate commerce in which complainants are engaged, in assembling raw materials and in shipping the finished product, is affected even remotely by either the production of the raw materials or their manufacture into the finished product. As was said in the Dagenhart Case:

"The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped or used in interstate commerce make their production a part thereof. * * * Over interstate transportation, or its incidents, the regulatory power of Congress is ample; but the production of articles, intended for interstate commerce, is a matter of local regulation."

[9] It is not even claimed that the proposed investigation is for the purpose of aiding Congress in the exercise of the federal police power, or for the purpose of effecting a possible disclosure of some vague ground upon which Congress might be induced to attempt its exercise by legislation. The dividing line between a strictly private enterprise and a "business impressed with a public interest" has not been clearly defined. A corporation devoted wholly to the service of the public, and whose revenues are derived from fixed uniform charges for the various services rendered, as an insurance company (German Alliance Insurance Co. v. Kansas, 233 U. S. 389, 34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189), or an elevator company (Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77), or a bank (Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487), may well be so impressed with a public interest as to justify its regulation for the promotion of the public welfare. But this modern doctrine, so frequently invoked in justification of the assertion of the police power, has no application to the steel and iron business. There is no governmental power that can be invoked to compel the steel companies to serve the public, nor do they assume to render a public service.

The large percentage of their products go into the construction of the instrumentalities of transportation which are owned and employed by companies engaged in commerce, which, in their interstate aspect, are subject to federal control; but that implies no authority in the government to regulate the production of a mere commodity entering into an agency, the management and control of which Congress has the delegated power to regulate. Complainant companies are engaged in a competitive productive industry, similar to the woolen or cotton man-

ufacturers and those engaged in numerous other industries, where the business is regulated by competition and supply and demand, and the product enters into the general volume of commerce, subject to all the natural laws and conditions which generally govern and affect trade.

Citation is made in brief of counsel of instances where private corporations submitted to requests of the Commission for so-called "war reports" and answered without objection. But the emergency caused by the war has passed, and no test was made of the jurisdiction of the Commission to proceed, even in those cases. It is unnecessary, therefore, to consider the authority of the Commission in a war emergency, since the question of jurisdiction was not raised, and the circumstances which there obtained are not present here.

The cases relied upon by the Commission relate chiefly to the power of Congress, either directly or through the Commission, to regulate and inquire into the affairs of corporations engaged in the operation of instrumentalities of interstate commerce, or industries so closely allied as to form a part of the general business entering into such commerce, and capable of being so conducted as to impose a burden on interstate commerce. They arose upon charges, in some instances civil and in others criminal, based upon violations of the Anti-Trust Act, or unfair methods of competition in commerce, or violations of the Federal Trade Commission Act, or of so conducting a business as to obstruct or burden interstate commerce. They are not pertinent, however, to this inquiry, since the manufacturing business of complainants is not commerce, and, therefore, not subject to regulation by Congress, or investigation by the Commission.

Special reliance, however, is placed upon the recent decision of the Supreme Court of the United States in Stafford et al. v. Wallace et al. and Burton et al. v. Clyne, 258 U. S. 495, 42 Sup. Ct. 397, 66 L. Ed. ——, involving the validity of an act of Congress providing—

"for the supervision by federal authority of the business of the commission men and of the live stock dealers in the great stockyards of the country."

In an action for injunction to restrain the enforcement of the act, the court held that the plan of operation of the stockyards companies was so closely allied with interstate commerce as to amount to a scheme for monopolization thereof. The court, basing its opinion upon the decision in Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, said:

"It is manifest that Congress framed the Packers and Stockyards Act in keeping with the principles announced and applied in the opinion in the Swift Case. The recital in section. 2, par. (b), of title 1 of the act, quoted in the margin. leaves no doubt of this. The act deals with the same current of business, and the same practical conception of interstate commerce."

While in some instances the great volume of live stock passing in commerce through the stockyards of the country is transformed into dressed meat, the court was careful to distinguish the processes employed from manufacture in general. As was said in the Swift Case:

"Therefore the case is not like United States v. E. C. Knight Co., 156 U. S. 1, where the subject-matter of the combination was manufacture and the direct object monopoly of manufacture within a state. However likely mo-

nopoly of commerce among the states in the article manufactured was to follow from the agreement, it was not a necessary consequence nor a primary end. Here the subject-matter is sales, and the very point of the combination is to restrain and monopolize commerce among the states in respect of such sales. The two cases are near to each other, as sooner or later always must happen where lines are to be drawn, but the line between them is distinct."

In Hill et al. v. Wallace, 257 U. S. 310, 42 Sup. Ct. 168, 66 L. Ed. 253, the court, referring to the Stafford Case, held it to be within the power of Congress to regulate business in the stockyards of the country, and include therein the regulation of commission men and of traders there, although they had to do only with sales completed and ended within the yards, because Congress had concluded that, through exorbitant charges, dishonest practices, and collusion, they were likely, unless regulated, to impose a direct burden on the interstate commerce passing through. This again clearly distinguishes the Stafford Case, since in the present case commerce does not pass through the plants where the processes of manufacture are conducted.

[18] In these cases the court was dealing directly with the validity of statutes in which the purpose of Congress was clearly expressed. In the present case, however, there is no statute, and no object has been even intimated by Congress, nor are we enlightened by any definite statement from the Commission of its purpose in making the investigation. The most that can be gathered from the answer is that a general survey of the coal, coke, steel, and allied industries is contemplated, in a tentative search for information relative to the high cost of living. We are not impressed by the contention that the Commission is invested with authority to inquire into and regulate any business of nationwide extent, or that the scope of its visitorial powers are coextensive with the constitutional functions of Congress. As already suggested, we think the activities of the Commission are strictly limited to the field of commerce, except so much thereof as has been occupied by the Act to Regulate Commerce and by the Federal Reserve Act, 38 Stat. 251.

The decree is affirmed, with costs.

SMYTH, Chief Justice (dissenting). Being unable to concur in the opinion just announced, I state in a very general way the reasons for my dissent. For convenience I shall speak of the defendants as the Commission.

This case does not call for a decision as to whether or not Congress or the Federal Trade Commission, acting by its authority, has the power to regulate manufacture or intrastate commerce. The order of the Commission which is challenged does not seek to regulate anything. It simply calls for information relative to the activities of the plaintiffs in manufacture and commerce, both interstate and intrastate. It bases its claim to that part of the information which relates to manufacture and intrastate commerce upon the postulate that it is necessary to enable Congress and the Commission to perform their respective duties with regard to commerce between the states, or at least that it is appropriate for that purpose.

The trial court sustained the plaintiffs' motion to strike the Commis-

285 F.—60

sion's amended answer (hereafter called the answer), on the ground that it did not state a defense, and entered a decree for the plaintiffs. All its allegations, therefore, which are properly pleaded must be treated as admitted. Among other things, it alleges that plaintiffs are engaged in interstate commerce; that it is necessary that the Commission procure complete information as to all the business of each of the plaintiffs in order that it shall perform its duty as to their interstate commerce; that unless the information is produced the Commission will be unable to properly perform that duty, for the reasons that all of the plaintiffs, while engaged substantially in interstate commerce, have also certain activities which are performed intrastate, and which activities are so interwoven with their interstate business that it is impossible to separate them; and that, even if they could be separated, the separation would render the result untrue and inaccurate, and of little or no value in enabling the Commission to perform its regulatory duties as to the interstate business of the plaintiffs. The answer also alleges that the information sought is necessary to enable Congress to perform its duties with respect to regulating the interstate and foreign commerce of the plaintiffs.

It is argued that the allegations of the answer to the effect that the information sought is necessary to enable Congress and the Commission to perform their respective duties in regard to commerce between the states are mere conclusions of fact, and as such were not admitted by the motion; that the pleader should have set forth the facts from which it deduces the conclusion that the information is necessary. To this I cannot accede. The purpose of the answer was to advise the plaintiffs as to what the Commission expected to prove. This purpose was sufficiently served by stating the ultimate or operative facts. It was not required that the evidence upon which the Commission relied to establish the facts should be set out. If the plaintiffs desired a more specific statement, it was their right to move for it under equity rule 20 (198 Fed. xxiv, 115 C. C. A. xxiv) promulgated by the Supreme Court of the United States. This they did not do. A general statement of the essential ultimate facts upon which the defense rests is enough.

"It was not necessary to aver * * * all the minute circumstances which may be proven in support of the general statement. * * *"

The answer distinctly apprised the plaintiffs of the precise case they were required to meet. St. Louis v. Knapp Co., 104 U. S. 658, 661, 26 L. Ed. 883. As was said by Mr. Justice Holmes, delivering the opinion of the court in Swift & Co. v. United States, 196 U. S. 375, 395, 25 Sup. Ct. 276, 279 (49 L. Ed. 518):

"A bill in equity is not to be read and construed as an indictment would have been read and construed a hundred years ago, but it is to be taken to mean what it fairly conveys to a dispassionate reader by a fairly exact use of English speech."

See, also, United States v. United Shoe Machinery Co. (D. C.) 234 Fed. 127, 136.

It is my opinion that the answer sufficiently alleged that the infor-

mation sought was necessary or at least appropriate for the purposes indicated, and that the motion to strike admitted it.

Plaintiffs allege in variant forms that the Commission is not authorized by the act creating it to demand the information sought. Section 6 of the act is set out in the opinion of the court. It authorizes the Commission:

"To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any corporation engaged in commerce," to require, "by general or special orders, corporations engaged in commerce ° ° ° to file with the Commission in such form as the Commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, [and] practices" of the corporations mentioned. And it is declared to be the duty of the Commission "to make public from time to time such portions of the information obtained by it ° ° ° except trade secrets and names of customers, as it shall deem expedient in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation," etc.

The commerce spoken of is interstate.

In the answer it is alleged, and not denied, that all the plaintiffs are engaged in interstate commerce, and that 65 per cent. of their business, save as to three, is such commerce. They belong, therefore, to the class of corporations "concerning" which the act authorizes the Commission to gather information. Does the information requested come within the purview of the act? It relates to the "business, conduct, practices, and management" of the corporate plaintiffs. It is called for in the form of special reports, and is sought for the purpose of making it public and of laying it before Congress, with recommendations for additional legislation.

It is urged that, while the information relates to the business, etc., of the plaintiffs, this is not enough—that it must concern the interstate commerce features of that business. The answer, as we have shown, alleges, and the allegation is admitted, that the information is necessary in order that the Commission and Congress may perform their duties with respect to the interstate features of the business. Since this is true, it must concern those features, and therefore it is such as the Commission is authorized to gather.

The next inquiry is as to whether Congress had the power to confer upon the Commission authority to gather information with respect to the manufacturing and intrastate activities of corporations engaged in commerce between the states, to the end that it might regulate, either by legislation or otherwise, the commerce over which it has jurisdiction. The requiring of information concerning a business is not a regulation of that business. Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S. 194, 211, 32 Sup. Ct. 436, 56 L. Ed. 729. In that case reports were called for by the Commission with respect to intrastate business. The corporation refused to supply it, on the ground that the Commission had no power to demand such information, because it related to intrastate business. But the court said that, since the information was essential to enable the Commission to perform its required duties touching interstate commerce, the Commission had a

right to require it. There are other decisions to the effect that Congress may enter the domain of intrastate activities whenever it is appropriate that it should do so, in order that it may properly exercise its regulatory power with respect to interstate commerce. Interstate Commerce Commission v. Cincinnati, New Orleans & Texas Pacific Railway Co., 167 U. S. 479, 506, 17 Sup. Ct. 896, 42 L. Ed. 243; Schollenberger v. Pennsylvania, 171 U. S. 1, 21, 18 Sup. Ct. 757, 43 L. Ed. 49; Minnesota Rate Cases, 230 U. S. 352, 431, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

One of the briefs for the plaintiffs admits that, as soon as any concrete legislation should be submitted to or contemplated by Congress, "it would have full power to secure any and all information indispensable to a proper consideration and disposition of such proposed legislation."

I think this concession is sound, but it is too restricted. May it not be essential that Congress should have information on a given phase of commerce before it formulates any concrete legislation or contemplates legislation with reference to it? And, if so, why should it not have the same right to gather it as it would have, according to the concession, where legislation is actually pending? To say that it may authorize the procuring of all the facts necessary to the proper disposition of pending legislation, but that it has no power to gather what may be appropriate to enable it to determine whether any legislation is necessary, does not appeal to me as correct.

But it is argued that the regulatory power of Congress must be exercised through legislation, and that information desired for the mere purpose of publication may not be required by it. There is nothing in the Constitution which says how Congress shall exercise its regulatory power. This is left to its judgment. Former Senator Burton, of Ohio, in his work on Corporations and the State, 60, 61, after a very careful consideration of the matter, declared that "of all regulations which promise results publicity should be placed first."

It is beyond dispute that Congress has no general visitatorial powers over state corporations, but it has been decided that it has power to visit them for the purpose of seeing "that its own laws are respected." Wilson v. United States, 221 U. S. 361, 384, 31 Sup. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558. By a parity of reasoning may it not be said that if it is necessary to protect interstate commerce, or appropriate for that purpose, that Congress should enter the field of intrastate commerce, it may do so? Houston & Texas Railway Co. v. United States, 234 U. S. 342, 34 Sup. Ct. 833, 58 L. Ed. 1341. In that case the court said that Congress possesses—

"the power to foster and protect interstate commerce, and to take all measures necessary or appropriate to that end, although intrastate transactions of interstate carriers may thereby be controlled." 234 U. S. at page 353, 34 Sup. Ct. at page 837 (58 L. Ed. 1341).

The power of Congress to require the production of the information in question is defended by the Commission upon several grounds in addition to those I have mentioned, but I do not think it necessary for me to go further into the subject.

I am satisfied that the law requires that the information demanded be supplied, and therefore I think the decree of the lower court should be reversed, and the bill dismissed.