

## OFFICE OF THE ATTORNEY GENERAL OF TEXAS
### AUSTIN

**GROVER SELLERS**

**ATTORNEY GENERAL**

Hon. Geo. H. Sheppard
Comptroller of Public Accounts
Austin, Texas

Dear Sir:

Opinion No. 0-5743
Re: Tax liability of C. S. Weeks,
Trucking Contractor.

You request the opinion of this department as to
the liability of C. S. Weeks, Trucking Contractor, for gross
receipts tax under Article 14 of House Bill 8 of the 47th
Legislature, and for convenience your letter is quoted in
full as follows:

"Article 14 of House Bill 8 of the 47th Legislature
provides for a tax of 2.2% on gross receipts earned by
contract motor carriers, as defined in Chapter 277, Acts
of the Regular Session of the 42nd Legislature.

"Mr. C. S. Weeks, doing business as C. S. Weeks
Trucking Contractor, Fort Worth, Texas, operates under
a contract motor carrier's permit No. 11509. This con-
cern has a contract with the U. S. War Department,
Quartermaster Division; they haul perishable merchandise,
under U. S. Government seals, between Fort Worth Quarter-
master Depot and various Texas Army camps.

"The Fort Work Market Center is one of five in Texas.
It receives from the various camps in its territory requisi-
tions for produce in specific amounts, for deliveries, at
specified dates. These requisitions are supposed to reach
the Fort Worth Center at least twenty days before the
expected date of delivery to the various camps. The Fort
Worth Center supplies either camps too small to buy in
carload lots, or fill in orders between carload shipments
to the larger camps.

Hon. Geo. H. Sheppard, page 2

"Mr. Weeks states that 90% of all goods handled at the Fort Worth Center originate from without the State.

"I am herewith handing you a brief submitted by the attorney for Mr. Weeks. Mr. Weeks contends that his operations are interstate and that he is not liable for the gross receipts tax.

"Your Department has previously ruled on two occasions with reference to contract motor carriers who contended they were operating interstate, and I refer you to your Opinions O-5335 and O-5468, of which I am enclosing copies.

"I will appreciate it if you will give me your opinion as to the tax liability of C. S. Weeks, Trucking Contractor."

The answer to your question must depend upon whether, under the state of facts applicable to Weeks operations, he is engaged in interstate or intrastate commerce as to the commodities transported by him. If interstate, then concededly no tax is due. We have reached the conclusion that all the commodities transported by Weeks having a point of origin without the State are in interstate commerce, and, therefore, the gross receipts therefrom exempt from tax.

In reaching this conclusion, we have not been unmindful of the break in the shipments at Fort Worth, from which point Weeks begins his transportation. Unless this break is of such nature as to convert the shipments from interstate into intrastate in proceeding from Fort Worth, we must still treat the shipments as interstate. Does such a transition take place at Fort Worth? We think not.

One cogent factor must be kept in mind, and that is that Fort Worth is merely the central situs for distribution of the products by one government agency to another, and not a point of ultimate destination. The respective Army camps to which the products are distributed constitute the final destination; and this is so understood by all the parties, which understanding is consummated in truth and in fact. To conclude otherwise we would have to substitute form for substance, fiction for truth. In thus concluding, we are not

Hon, Geo. H. Sheppard, page 3

unmindful that our Courts, including the Supreme Court of
the United States, recognize a distinction in tax cases
from other fields wherein only reasonable and solitary
regulations may be involved.  This is manifest from the
following taken from the case of Stafford v. Wallace
(Supreme Court of the United States) 23 A. L. R. 229, quot-
ing with approval from Swift & Co. v. U. S., 49 L. Ed. 518:

"'But we do not mean to imply that the rule
which marks the point at which state taxation or
regulation becomes permissible necessarily is beyond
the scope of interference by Congress where such inter-
ference is deemed necessary for the protection of com-
merce among the states.'

". . .

"'The question, it should be observed, is not with
respect to the extent of the power of Congress to regu-
late interstate commerce, but whether a particular exer-
cise of state power, in view of its nature and operation,
must be deemed to be in conflict with this paramount
authority.'"

But the Court in this same case said:

"Moreover, it will be noted that even in tax cases,
where the tax is directed against a commodity in an actual
flowing and constant stream out of a state, from which the
owner may withdraw part of it for use or sale in the state
before it reaches the state border, we have held that a
tax on the flow is a burden on interstate commerce which
the state may not impose because such flow in interstate
commerce is an established course of business.  United
Fuel Gas Co. v. Hallanan, decided December 12, 1921 (257
U. S. 277, 66 L. ed. 234, 42 Sup. Ct. Rep. 105); Eureka
Pipe Line Co. v. Hallanan, decided December 12, 1921 (257
U. S. 265, 66 L. ed. 227, 42 Sup. Ct. Rep. 101). . . ."

The very recent case of Walling v. Jacksonville
Paper Co., (Supreme Court of the United States) 87 L. Ed. 393,
makes clear the rule which we think applicable to this case.
We quote:

Hon. Geo. H. Sheppard, page 4

"The Administrator contends in the first place
that under the decision below any pause at the ware-
house is sufficient to deprive the remainder of the
journey of its interstate status. In that connection
it is pointed out that prior to this litigation re-
spondent's trucks would pick up at the terminals of
the interstate carriers goods destined to specific
customers, return to the warehouse for checking and
proceed immediately to the customer's place of business
without unloading. That practice was changed. The
goods were unloaded from the trucks, brought into the
warehouse, checked, reloaded, and sent on to the
customer during the same day or as early as convenient.
The opinion of the Circuit Court of Appeals is susceptible
of the interpretation that such a pause at the warehouses
is sufficient to make the Act inapplicable to the subse-
quent movement of the goods to their intended destination.
We believe, however, that the adoption of that view would
result in too narrow a construction of the Act. It is
clear that the purpose of the Act was to extend federal
control in this field throughout the farthest reaches
of the channels of interstate commerce. There is no
indication (apart from the exemptions contained in () 13,
29 USCA () 213) that, once the goods entered the channels
of interstate commerce, Congress stopped short of control
over the entire movement of them until their interstate
journey was ended. No ritual of placing goods in a ware-
house can be allowed to defeat that purpose. The entry
of the goods into the warehouse interrupts but does not
necessarily terminate their interstate journey. A tem-
porary pause in their transit does not mean that they
are no longer 'in commerce' within the meaning of the Act.
As in the case of an agency (cf. De Loach v. Crowley's,
Inc. (CCA 5th) 128 F(2d) 378) if the halt in the movement
of the goods is a convenient intermediate step in the
process of getting them to their final destinations, they
remain 'in commerce' until they reach those points. Then
there is a practical continuity of movement of the goods
until they reach the customers for whom they are intended.
That is sufficient. Any other test would allow formalities
to conceal the continuous nature of the interstate transit
which constitutes commerce.

Hon. Geo. H. Sheppard, page 5

". . . If there is a practical continuity of
movement from the manufacturers or suppliers without
the state, through respondent's warehouse and on to
customers whose prior orders or contracts are being
filled, the interstate journey is not ended by reason
of a temporary holding of the goods at the warehouse.
The fact that respondent may treat the goods as stock
in trade or the circumstance that title to the goods
passes to respondent on the intermediate delivery does
not mean that the interstate journey ends at the ware-
house.  The contract or understanding pursuant to which
goods are ordered, like a special order, indicates where
it was intended that the interstate movement should
terminate. . . ."

The case of Baltimore & O. S. W. R. Co. v. Settle,
(Supreme Court of the United States) 67 L. Ed. 166, is typical
of the rule that the intention of the parties as to when and
where the shipment comes to its ultimate end is of paramount
importance in determining whether the shipment is interstate
or intrastate from an intermediate point of interruption or
pause within the State. We quote from this case as follows:

"If the intention with which the shipment was made
had been actually in issue, the fact that possession of
the cars was taken by the shipper at Oakley, and that
they were not rebilled for several days, would have
justified the jury in finding that it was originally
the intention to end the movement at Oakley, and that
the rebilling to Madisonville was an afterthought.  But
the defendant Clephane admitted at the trial that it was
intended from the beginning that the cars should go to
Madisonville; and this fact was assumed in the instruc-
tions complained of.  In other words, Madisonville was
at all times the destination of the cars; Oakley was
to be merely an intermediate stopping place; and the
original intention persisted in was carried out.  That
the interstate journey might end at Oakley was never
more than a possibility.  Under these circumstances,
the intention, as it was carried out, determined, as
matter of law, the essential nature of the movement;
and hence, that the movement through to Madisonville was
an interstate shipment.  For neither through billing,
uninterrupted movement, continuous possession by the
carrier, nor unbroken bulk, is an essential of a through
interstate shipment.  These are common incidents of a

through shipment; and when the intention with which a shipment was made is in issue, the presence or absence of one or all of these incidents may be important evidence bearing upon that question. But where it is admitted that the shipment made to the ultimate destination had at all times been intended, these incidents are without legal significance as bearing on the character of the traffic. For instance, in many cases involving transit or reconsignment privileges in blanket territory, most or all of these incidents are absent, and yet the through interstate tariffs apply."(citing cases)

To the same effect is the case of Binderup v. Pathe Exchange, 68 L. Ed. 308, (Supreme Court of the United States) in the following language:

"The intermediate delivery to the agency did not end, and was not intended to end, the movement of the commodity. It was merely halted as a convenient step in the process of getting it to its final destination. The general rule is that where transportation has acquired an interstate character, 'it continues at least until the load reaches the point where the parties originally intended that the movement should finally end.'" (Loc. Cit. 68 L. Ed. 316)

We deem the foregoing sufficient to support our conclusion that the operations of C. S. Weeks, under the facts submitted, are not subject to gross receipts tax imposed by Article 14 of House Bill No. 8, Acts of the 47th Legislature insofar as applicable to the products (perishable fruits and vegetables) shipped from without the State, and hence interstate shipments; but as to that portion of the shipments, whether ten per cent, more or less, originating within the State, and admittedly intrastate, the tax is due and owing by C. S. Weeks, and you are accordingly so advised.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By

L. P. Lollar
Assistant

LPL:AMM



APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN